EMILIO M. GARZA, Circuit Judge,
dissenting:
In vacating our previous opinion, Fisher v. Univ. of Tex. at Austin, 631 F.3d 213 (5th Cir.2011), the Supreme Court clarified the strict scrutiny standard as it applies to cases involving racial classifications in higher education admissions: Now, reviewing courts cannot defer to a state actor’s argument that its consideration of race is narrowly tailored to achieve its diversity goals. Fisher v. Univ. of Tex. at Austin, — U.S. -, 133 S.Ct. 2411, 2420, 186 L.Ed.2d 474 (2013). Although the University has articulated its diversity goal as a “critical mass,” surprisingly, it hás failed to define this term in any objective manner. Accordingly, it is impossible *662 to determine whether the University’s use of racial classifications in its admissions process is narrowly tailored to its stated goal — essentially, its ends remain unknown.
By holding that the University’s use of racial classifications is narrowly tailored, the majority continues to defer impermis-sibly to the University’s claims. This deference is squarely at odds with the central lesson of Fisher. A proper strict scrutiny analysis, affording the University “no deference” on its narrow tailoring claims, compels the conclusion that the University’s race-conscious admissions process does not survive strict scrutiny.
I
As .a preliminary matter, Fisher has standing to pursue this appeal, but not because, as the majority contends, the Supreme Court’s opinion does “not allow our reconsideration [of the issue of standing].” Ante, at 640.
Federal courts have an affirmative duty to verify jurisdiction before proceeding to the merits. Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Although standing was actively contested before the Supreme Court, and although the Court’s opinion is silent about the issue,[1] the Supreme Court has specifically warned against inferring jurisdictional holdings from its opinions not explicitly addressing that subject. See Steel Co., 523 U.S. at 91, 118 S.Ct. 1003. Accordingly, the issue of standing remains open, and this court is obliged to address it. Id. at 94-95, 118 S.Ct. 1003.
In our previous opinion, we held that Fisher had standing to “challenge [her] rejection and to seek money damages for [her] injury.” Fisher, 631 F.3d at 217. Only one relevant fact has changed since then-in 2012, Fisher graduated from Louisiana State University. The University contends that by graduating, “her forward-looking request for relief became moot” because she could no longer seek reconsideration of her undergraduate application. Fisher’s graduation does not alter our previous standing analysis because, as she correctly observes, that determination did not depend on a claim for forward-looking injunctive relief. Id. We held that Fisher had standing to seek nominal monetary damages, and we should reach the same conclusion now.
The University relies on Texas v. Lesage, 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999) (per curiam), for the proposition that Fisher lacks standing because she would not have been admitted regardless of her race. But even if Lesage is a standing case (which is a debatable premise — the case seems to address statutory liability under § 1983), it does not affect the outcome here. Lesage stands for the proposition that a plaintiff challenging governmental use of racial classifications cannot prevail if “it is undisputed that the government would have made the same decision regardless” of such use. Id. at 21, 120 S.Ct. 467 (emphasis added). The University asserts that Fisher would not have been admitted even if she had a “perfect” PAI score. The majority agrees. Ante, at 639 (“If [Fisher] had been a minority the result would have been the same.”). While Fisher would have been denied admission during the 2008 admissions cycle even if she had a top PAI score, this is not the relevant inquiry. Rather, as Fisher explains, the proper question is whether she would have fallen above the admissions cut-off line if that line had been *663 drawn on a race-neutral distribution of all applicants’ scores. This record does not indicate whether Fisher would have been admitted if race were removed from the admissions process altogether. At the least, this is a complex question that is far from “undisputed.” See Lesage, 528 U.S. at 21, 120 S.Ct. 467. Even the University acknowledges that the answer to this question is practically unknowable: It concedes that re-engineering the 2008 admissions process by retroactively removing consideration of race is virtually impossible since race has an immeasurable, yet potentially material, impact on the placement of the final admissions cut-off lines for all programs. In sum, the record does not show that Fisher’s rejection under a race-neutral admissions process is “undisputed,” and remanding to the district court could not alter the record in this regard.
The University further challenges Fisher’s standing on redressability grounds. The University’s theory is that even if Fisher had been admitted through the race-conscious admissions program, and had not suffered the injury of rejection, she still would have paid the non-refundable application fee. Thus, says the University, because the application fee has no causal link to her injury, any judicial relief would fail to provide redress. This argument misconstrues the nature of Fisher’s alleged injury — it is not her rejection, but the denial of equal protection of the laws during the admissions decision process. Fisher correctly explains that the application fee represents nominal damages for the alleged constitutional harm stemming from the University’s improper use of racial classifications.[2] Because this harm would have befallen Fisher whether or not she was ultimately admitted to the University, the non-refundable nature of the application fee is irrelevant.[3]
II
Having confirmed our jurisdiction, our task is to apply strict scrutiny without any deference to the University’s claims. Because Fisher effected a change in the law of strict scrutiny, and corrected our understanding of that test as applied in Grutter v. Bollinger, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003), I first review the current principles governing this “searching examination.” Fisher, 133 S.Ct. at 2420.
The Equal Protection Clause of the Fourteenth Amendment provides that no State shall “deny to any person within its jurisdiction the equal protection of the laws.” U.S. CONST, amend. XIV. It is canonical that the Constitution treats distinctions between citizens based on their race or ethnic origin as suspect, see, e.g., Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954), and that the Equal Protection Clause “demands that racial classifications ... be subjected to the most rigid scrutiny,” Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). Thus, strict scrutiny begins from the fundamental proposition *664 that “any official action that treats a person differently on account of his race or ethnic origin is inherently suspect.” Fullilove v. Klutznick, 448 U.S. 448, 523, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Stewart, J., dissenting). This is “because racial characteristics so seldom provide a relevant basis for disparate treatment.” Richmond v. J.A. Croson Co., 488 U.S. 469, 505, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). “Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people.” Fisher, 133 S.Ct. at 2418 (quoting Rice v. Cayetano, 528 U.S. 495, 517, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000)).
When a state university makes race-conscious admissions decisions, those decisions are governed by the Equal Protection Clause, even though they may appear well-intended. See Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 297, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.). Simply put, the Constitution does not treat race-conscious admissions programs differently because their stated aim is to help, not to harm.
Under strict scrutiny, a university’s use of racial classifications is constitutional only if necessary and narrowly tailored to further a compelling governmental interest. See Grutter, 539 U.S. at 326, 123 S.Ct. 2325. It is well-established that there is a compelling governmental interest in obtaining the educational benefits of a diverse student body. See Bakke, 438 U.S. at 311-12, 98 S.Ct. 2733 (holding that the “attainment of a diverse student body” is a “constitutionally permissible goal for an institution of higher education”). Grutter and Gratz v. Bollinger, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003), confirmed this. See Fisher, 133 S.Ct. at 2418.[4] “The diversity that furthers a compelling [governmental] interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.” Bakke, 438 U.S. at 315, 98 S.Ct. 2733. Thus, diversity cannot be defined by a “specified percentage of a particular group,” id. at 307, 123 S.Ct. 2325, because such a definition would be “patently unconstitutional racial balancing,” Grutter, 539 U.S. at 330, 123 S.Ct. 2325. In applying strict scrutiny, it is proper for courts to defer to a university’s decision to pursue the compelling governmental interest of diversity based on its “educational judgment that such diversity is essential to its educational mission.” Id. at 328, 123 S.Ct. 2325. But, deference to the University is appropriate on this point, and this point alone. Fisher, 133 S.Ct. at 2421.
Once a university has decided to pursue this compelling governmental interest, it must prove that the means chosen “to attain diversity are narrowly tailored to that goal.” Fisher, 133 S.Ct. at 2420. In this, the strict scrutiny test takes the familiar form of a “means-to-ends” analysis: The compelling governmental interest is the ends, and the government program or law — here, the University’s race-conscious admissions program — is the means. Strict scrutiny places the burden of proving narrow tailoring firmly with the government. See Johnson v. California, 543 U.S. 499, 505, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005). And, furthermore, narrow tailoring must be established “with clarity.” Fisher, 133 S.Ct. at 2418.
*665 Before this case, the Supreme Court had issued only three major decisions addressing affirmative action in higher education admissions: Bakke, Gratz, and Grutter. In Fisher, the Court made clear that this line of cases does not stand apart from “broader equal protection jurisprudence.” Id. at 2418. Rather, “the analysis and level of scrutiny applied to determine the validity of [a racial classification] do not vary simply because the objective appears acceptable....” Id. at 2421 (quoting Miss. Univ. for Women v. Hogan, 458 U.S. 718, 724 n. 9, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982)).
In Fisher, the Supreme Court modified the narrow tailoring calculus applied in higher education affirmative action cases. While the overarching principles from Bakke, Gratz, and Grutter — that a university can have a compelling interest in attaining the educational benefits of diversity, and that its admissions program must be narrowly tailored to serve this interest — were taken “as given,” id. at 2417-18, the Fisher Court altered the application of those principles in a critical way. Now, courts must give “no deference,” to a state actor’s assertion that its chosen “means ... to attain diversity are narrowly tailored to that goal.” Id. at 2420. In so doing, the Fisher Court embraced Justice Kennedy’s position on “deference” from Grutter.[5] Thus, under the current principles governing review of race-conscious admissions programs, providing any deference to a state actor’s claim that its use of race is narrowly tailored is “antithetical to strict scrutiny, not consistent with it.” Grutter, 539 U.S. at 394, 123 S.Ct. 2325 (Kennedy, J., dissenting).
Because the higher-education affirmative action cases do not stand apart from “broader equal protection jurisprudence,” Fisher, 133 S.Ct. at 2418, strict scrutiny must be applied with the same analytical rigor deployed in those other contexts. Put simply, there is no special form of strict scrutiny unique to higher education admissions decisions. Accordingly, we must now evaluate narrow tailoring by ensuring that “the ‘means chosen ‘fit’ the [compelling governmental interest] so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.” Croson, 488 U.S. at 493, 109 S.Ct. 706.[6] Narrow tailoring further requires that “the reviewing court verify that it is necessary for a university to use race to achieve the educational benefits of diversity.” Fisher, 133 S.Ct. at 2420 (internal citations and quotations omitted). To do so, we *666 must carefully inquire into whether the University “could achieve sufficient diversity without using racial classifications.” Id. Establishing narrow tailoring does not require the University to show that it exhausted every possible race-neutral option, but it must meet its “ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice.” Id.
Of course, all of the above must be underscored by the principle that using racial classifications is permissible only as a “last resort to achieve a compelling interest.” Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 790, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007) (Kennedy, J, concurring).[7]
Ill
Here, the University has framed its goal as obtaining a “critical mass” of campus diversity. To uphold the use of race under strict scrutiny, courts must find narrow tailoring through a close “fit” between this goal and the admissions program’s consideration of race.[8] Accordingly, the controlling question becomes the definition of “critical mass” — the University’s stated goal. In order for us to determine whether its use of racial classifications in the admissions program is narrowly tailored to its goal, the University must explain its goal, and do so “with clarity.” Fisher, 133 S.Ct. at 2418. On this record, it has not done so.
The majority entirely overlooks the University’s failure to define its “critical mass” objective for the purposes of assessing narrow tailoring. This is the crux of this case — -absent a meaningful explanation of its desired ends, the University cannot prove narrow tailoring under its strict scrutiny burden. Indeed, the majority repeatedly invokes the term “critical mass” without even questioning its definition. See, e.g., ante, at 649 (“But minority representation then remained largely stagnant, within a narrow oscillating band, rather than moving towards a critical mass of minority students.”); id. at 654 (“Achieving the critical mass requisite to diversity goes astray when it drifts to numerical metrics.”); id. (“Fisher refuses to acknowledge this distinction between critical mass — the tipping point of diversity- — -and a quota.”); id. at 656 (“Critical mass, the tipping point of diversity, has no fixed upper bound of universal application, nor is it the minimum threshold at which minority students do not feel isolated or like spokespersons for their race.”). Under Fisher, it is not enough for a court to simply state, as does the majority, that it is not deferring to the University’s narrow tailoring arguments. See, e.g., id., at 646 (“Affording no deference, we look for narrow tailoring .... ”). Rather, the reviewing court’s actual analysis must demonstrate that “no deference” has been afforded. Fisher, *667 133 S.Ct. at 2420. Here, the majority’s failure to make a meaningful inquiry into the nature of “critical mass” constitutes precisely such deference.
Certainly, as explained below, I agree that “critical mass” does not require a precise numerical definition. See infra note 11. But, to meet its narrow tailoring burden, the University must explain its goal to us in some meaningful way. We cannot undertake a rigorous ends-to-means narrow tailoring analysis when the University will not define the ends. We cannot tell whether the admissions program closely “fits” the University’s goal when it fails to objectively articulate its goal. Nor can we determine whether considering race is necessary for the University to achieve “critical mass,” or whether there are effective race-neutral alternatives, when it has not described what “critical mass” requires.[9]
At best, the University’s attempted articulations of “critical mass” before this court are subjective, circular, or tautological. See infra Part III.A. The University explains only that its “concept of critical mass is defined by reference to the educational benefits that diversity is designed to produce.” And, in attempting to address when it is likely to achieve critical mass, the University explains only that it will “cease its consideration of race when it determines ... that the educational benefits of diversity can be achieved at UT through a race-neutral policy....” These articulations are insufficient. Under the rigors of strict scrutiny, the judiciary must “verify that it is necessary for a university to use race to achieve the educational benefits of diversity.” Fisher, 133 S.Ct. at 2420 (internal quotations omitted). It is not possible to perform this function when the University’s objective is unknown, unmeasurable, or unclear.
The exacting scrutiny required by the Supreme Court’s “broader equal protection jurisprudence” is entirely absent from today’s opinion, which holds that the University has proven narrow tailoring even though it has failed to meaningfully articulate its diversity goals.
A
The University’s failure to define meaningfully its “critical mass” objective is manifest in its various strict scrutiny arguments. The University claims that its use of racial classifications is necessary and narrowly tailored because (1) quantitative metrics reflect an inadequate minority presence; (2) qualitative diversity is lacking; (3) certain selective colleges are insufficiently diverse; (4) its periodic review demonstrates that its goals have not yet been achieved; and (5) its use of racial classifications is almost identical to that approved in Grutter.[10] Each of these arguments falls short — either overlooking a *668 more narrowly tailored alternative or eliding any articulation of how this specific use of racial classification advances the University’s objective.
1
First, while not defining its “critical mass” goal with reference to specific quantitative objectives, the University claims that quantitative metrics are relevant in measuring its progress. The University “based its critical mass determination on several data points, including hard data on minority admissions, enrollment, and racial isolation” and found that its use of racial classifications “does increase minority enrollment.” [11] Accepting that such metrics bear some relevance to the University’s progress, this is insufficient to satisfy strict scrutiny. The University does not explain how admitting a very small number of minority applicants under the race-conscious admissions plan is necessary to advancing its diversity goal.
It is undeniable that the University admits only a small number of minority students under race-conscious holistic review. See Fisher, 631 F.3d at 262-63 (Garza, J., specially concurring). In 2008, the sole year at issue in this case, less than 20% of the class was evaluated under the race-conscious holistic review process. Even if we assume that all minority students who were admitted and enrolled in that year through the race-conscious holistic review process gained admission because of their race, this number is strikingly small — only 216 African-American and Hispanic students in an entering class of 6,322.[12] The University fails to explain how this small group contributes to its “critical mass” objective. “Racial classifications are simply too pernicious to permit any but the most exact connection between justification and [racial] classification.” Adarand, 515 U.S. at 236, 115 S.Ct. 2097 (emphasis added). But here, the University has not established a clear and definite connection between its chosen means and its desired ends of “critical mass.”
To be clear, I agree that a race-conscious admissions plan need not have a “dramatic or lopsided impact” on minority enrollment numbers to survive strict scrutiny, as the University reads Fisher’s arguments to suggest. But neither can the University prove the necessity of its racial classification without meaningfully explaining how a small, marginal increase in minority admissions is necessary to achieving its diversity goals. Thus, neither the small (and decreasing) percentage of minority holistic-review admittees, nor minorities’ “under-representation”, in holistic review admissions relative to whites, taken alone, *669 demonstrates narrow tailoring. See ante, at 646-47 & Appendix 1 (explaining that white students comprise a larger percentage of holistic review admittees than of the incoming class as a whole).[13]
Under the Equal Protection Clause, diversity cannot be assessed by strictly quantitative metrics, and, to the extent that numbers could be relevant in assessing “critical mass,” the University leaves this relevance entirely unexplained.
2
The University advances a second understanding of “critical mass,” which I will refer to as “qualitative.” Under this theory, the University says its goal is not boosting minority enrollment numbers alone, but rather promoting the quality of minority enrollment — in short, diversity within diversity. The University submits that its race-conscious holistic review allows it to select for “other types of diversity” beyond race alone, and to identify the most “talented, academically promising, and well-rounded” minority students. According to the University, these are crucial “change agents” who debunk stereotypes but who may fall outside the top 10% of their high school classes.
As a preliminary matter, these stated ends are too imprecise to permit the requisite strict scrutiny analysis. The University has not provided any concrete targets for admitting more minority students possessing these unique qualitative-diversity characteristics — that is, the “other types of diversity” beyond race alone. At what point would this qualitative diversity target be achieved? Because its ends are unknown to us, the University cannot meet its strict scrutiny burden.
But, even accepting the University’s broad and generic qualitative diversity ends, we cannot conclude that the race-conscious policy is constitutionally “necessary.” The University has not shown that qualitative diversity is absent among the minority students admitted under the race-neutral Top Ten Percent Law, Tex. Educ.Code Ann. § 51.803 (West 2009). That is, the University does not evaluate the diversity present in this group before deploying racial classifications to fill the remaining seats. The University does not assess whether Top Ten Percent Law ad-mittees exhibit sufficient diversity within diversity, whether the requisite “change agents” are among them, and whether these admittees are able, collectively or individually, to combat pernicious stereotypes. There is no such evaluation despite the fact that Top Ten Percent Law admit-tees also submit applications with essays, and are even assigned PAI scores for purposes of admission to individual schools.[14] Evaluating the composition of these admit-tees — 80% of the class in 2008 — before deploying racial classifications in the holistic admissions program might well reveal that racial classifications are not necessary to achieve the University’s qualitative diversity goals. See Fisher, 133 S.Ct. at 2420; see also Parents Involved, 551 U.S. at 790, 127 S.Ct. 2738 (explaining that racial classifications must be a “last resort to achieve a compelling interest” in order to survive strict scrutiny) (Kennedy, J., concurring).
In effect, the University asks this Court to assume that minorities admitted under *670 the Top Ten Percent Law do not demonstrate “diversity within diversity” — that they are somehow more homogenous, less dynamic, and more undesirably stereotypical than those admitted under holistic review. Thus, the University claims, absent its race-conscious holistic admissions program, it would lose the minority students necessary to achieving a qualitative critical mass. But it offers no evidence in the record to prove this, and we must therefore refuse to make this assumption.
Regrettably, the majority firmly adopts this assumption — that minority students from majority-minority Texas high schools are inherently limited in their ability to contribute to the University’s vision of a diverse student body.[15] The majority reasons that race-conscious holistic review is a “necessary complement,” ante, at 654, to the Top Ten Percent Law, which, on its own, would admit insufficient “students of unique talents and backgrounds who can enrich the diversity of the student body in distinct ways,” id., at 654. The majority’s discussion of numerous “resegregated” Texas school districts is premised on the dangerous assumption that students from those districts (at least those in the top ten percent of each class) do not possess the qualities necessary for the University of Texas to establish a meaningful campus diversity. See id., at 650-52. In this, it has embraced the very ill that the Equal Protection Clause seeks to banish. See Croson, 488 U.S. at 505, 109 S.Ct. 706 (“[Rjacial characteristics so seldom provide a relevant basis for disparate treatment.”); Fullilove, 448 U.S. at 523, 100 S.Ct. 2758 (“[A]ny official action that treats a person differently on account of his race or ethnic origin is inherently suspect.”) (Stewart, J., dissenting); Cayetano, 528 U.S. at 517, 120 S.Ct. 1044 (“Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people....”).
Moreover, the only fact from which the majority draws this alarming conclusion is the mere reality that these districts serve majority-minority communities. Ante, at 650-51 (“The de facto segregation of schools in Texas enables the Top Ten Percent Law to increase minorities in the mix, while ignoring contributions to diversity beyond race.”).[16] By accepting the University’s standing presumption that minority students admitted under the Top Ten Percent Law do not possess the characteristics necessary to achieve a campus environment defined by “qualitative diversity,” the majority engages in the very stereotyping that the Equal Protection Clause abhors.[17]
The record does not indicate that the University evaluates students admitted *671 under the Top Ten Percent Law, checking for indicia of qualitative diversity — diversity within diversity — before determining that race should be considered in the holistic review process to fill the remaining seats in the class. If the Top Ten Percent Law admittees were a sufficiently qualitatively diverse population, which they may well be so far as I can tell, then using race in holistic review to promote further diversity might not be necessary for the University to achieve its goal, and an upfront assessment of these admittees, before turning to race, could be a more narrowly-tailored option. And, in any event, the University offers no method for this court to determine when, if ever, its goal (which remains undefined) for qualitative diversity will be reached. Accordingly, the University has failed to carry its strict scrutiny burden of proving that its race-conscious admissions policy is necessary to achieving its diversity objective of a “qualitative” critical mass.
3
In earlier stages of this case, the University framed its diversity goal as achieving “classroom diversity.” The University suggested that classroom diversity and the distribution of minority students among colleges and majors were meaningful metrics in determining whether “critical mass” had been attained. And, indeed, the Supreme Court has recognized that increased diversity of perspectives in the classroom provides for a “livelier, more spirited, and simply more enlightening and interesting” experience. Grutter, 539 U.S. at 330, 123 S.Ct. 2325 (quoting Bakke, 438 U.S. at 307, 98 S.Ct. 2733). However, the University has distanced itself from this previously asserted goal, now claiming it “has never pursued classroom diversity as a discrete interest or endpoint,” but merely as “one of many factors” to be considered in evaluating diversity. Given the University’s failure to press the classroom diversity argument in its briefing on remand, the issue is almost certainly waived. See United States v. Griffith, 522 F.3d 607, 610 (5th Cir.2008) (“It is a well-worn principle that the failure to raise an issue on appeal constitutes waiver of that argument.”).
Notwithstanding this waiver, the majority addresses the issue of classroom diversity, contending that the University’s race-conscious admissions policy is necessary to give “high-scoring minority students a better chance of gaining admission to UT Austin’s competitive academic departments.” Ante, at 658. Perhaps, based on the structure of the University’s admissions process, it is possible that the use of race as a factor in calculating an applicant’s PAI score incrementally increases the odds that a minority applicant will be admitted to a competitive college within the University.[18] But hypothetical eonsid- *672 erations are not enough to meet a state actor’s burden under strict scrutiny. See United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (“The justification must be genuine, not hypothesized or invented post hoc in response to litigation.”). Rather, assuming that the University’s diversity goal is establishing classroom diversity, it is the University that bears the burden of proving that the use of race in calculating the PAI scores is necessary to furthering this goal. But instead of explaining how race enhances minority students’ prospects of admission to a competitive college or major, the University admissions officers’ deposition testimony specifically indicates that race could not be a decisive factor in any applicant’s admission,[19] and that it is impossible to determine whether race was in fact decisive for any particular applicant’s admission decision.[20] Absent any record evidence of the potential for race to be a decisive factor, the University cannot establish, as the majority claims, that its racial classifications could actually give any minority applicant “a better chance” of admission to a competitive college. Ante, at 658.
In short, the University has obscured its use of race to the point that even its own officers cannot explain the impact of race on admission to competitive colleges.[21] If race is indeed without a discernable impact, the University cannot carry its burden of proving that race-conscious holistic review is necessary to achieving classroom diversity (or, for that matter, any kind of diversity). Because the role played by race in the admissions decision is essentially unknowable, I cannot find that these racial classifications are necessary or narrowly tailored to achieving the University’s interest in diversity.
*673 4
The University further claims that its race-conscious admissions program is narrowly tailored because, with the help of a rigorous periodic review system, it will “cease its consideration of race when it determines ... that the educational benefits of diversity can be achieved at [the University] through a race-neutral policy ‘at reasonable cost’ to its other educational objectives.” The University seeks to assure us that periodic review of its admissions policy considers enrollment data, “evidence of racial isolation and the racial climate on campus,” and “other data including the educational benefits of diversity experienced in the classroom.” In simple language, the University asserts that it knows critical mass when it sees it.
On one level, the University’s review process captures the essence of the holistic diversity interest established in Bakke, validated in Grutter, and left intact by Fisher, See Ante at 643 (“Diversity is a composite of the backgrounds, experiences, achievements, and hardships of students to which race only contributes.”). In fact, the Grutter Court discussed the important role that such reviews can play in determining whether racial classifications have continuing necessity under strict scrutiny. Grutter, 539 U.S. at 342, 123 S.Ct. 2325.
Nonetheless, there are two distinct flaws with the University’s assurances that its own, internal, periodic review is sufficient to safeguard against any unconstitutional use of race. First, strict scrutiny does not allow the judiciary to delegate wholesale to state actors the task of determining whether a race-conscious admissions policy continues to be necessary. This is the very point made by the Fisher Court, in vacating our previous opinion for deferring to the University’s narrow-tailoring claims. Fisher, 133 S.Ct. at 2420-21.
Second, while the University correctly considers a range of factors in its assessment of the necessity of its use of race, see Bakke, 438 U.S. at 315, 98 S.Ct. 2733 (describing diversity as a “broader array of qualifications and characteristics” of which race is only one), it has still not explained to us how this consideration takes place. In describing its periodic review process, the University never explains how the various factors are measured, the weight afforded to each, and what combination thereof would yield a “critical mass” of diversity sufficient to cease use of racial classifications.
In light of this, I cannot determine that the race-conscious admissions program is narrowly tailored to the University’s goal. The University, in effect, defines critical mass as a nebulous amalgam of factors— enrollment data, racial isolation, racial climate, and “the educational benefits of diversity” — that its internal periodic review is calibrated to detect. But, without more, the University fails to prove narrow tailoring with clarity. Fisher, 133 S.Ct. at 2418. Such a bare submission, in essence, begs for the deference that is irreconcilable with “meaningful” judicial review. Id. at 2421.
5
Lastly, the University submits that its race-conscious admissions policy necessarily satisfies narrow tailoring because it is closely modeled on the admissions program upheld by the Supreme Court in Grutter. Similarly, the majority implies that the race-conscious admissions policy’s similarity to Grutter is, itself, a meaningful factor in our strict scrutiny analysis.[22] This claim is unpersuasive.
*674 Fisher confirms that we are obligated to consider the particular challenged race-conscious program on its own terms and ask whether the University “could achieve sufficient diversity without using racial classifications.” 133 S.Ct. at 2420. Strict scrutiny is not a hypothetical undertaking, but rather “imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice.” Id.
Certain aspects of the University’s admissions policy do parallel the features of the plan upheld in Grutter — race is only a sub-factor within a holistic, individualized review process, and the University’s goal is framed in terms of “critical mass.” But the University, under mandate by the Texas Legislature’s Top Ten Percent Law, admits the majority of its entering class through a separate, race-neutral scheme.[23] This inevitably impacts the narrow tailoring calculus presently under consideration. That is, while the University’s race-conscious admissions policy is conceptually derived from the University of Michigan Law School’s approach, the two are quite distinct in practice: The University’s holistic review coexists with a separate process that admits a large population of students, a circumstance not contemplated in Grut-ter.[24]
Similarity to Grutter is not a narrow-tailoring talisman that insulates the University’s policy from strict scrutiny. The University’s burden is to prove that its own use of racial classifications is necessary and narrowly tailored for achieving its own diversity objectives.
B
Ultimately, the record is devoid of any specifically articulated connection between the University’s diversity goal of “critical mass” and its race-conscious admissions process. The University has not shown how it determines the existence, or lack, of a “critical mass” of diversity in its student population. Rather, the University only frames its goal as “obtaining the educational benefits of diversity.” This is entirely circular reasoning that cannot satisfy the rigorous means-to-ends analysis required under strict scrutiny. Fisher, 133 S.Ct. at 2421.
To be clear, my concern is not with the University’s use of the term “critical mass” itself. Even if the University were to adopt another rhetorical construct to explain its diversity objectives, it faces the same underlying problem — it does not offer a clear and definite articulation of its goal sufficient for a reviewing court to verify narrow tailoring. The University’s failure to meet its strict scrutiny burden is *675 a function of its undefined ends, not its choice to label those ends as “critical mass.”
IV
The majority concludes that the University’s race-conscious admissions program is narrowly tailored because the University has exhausted all workable alternatives. Ante, at 660. Much of today’s opinion explores the historical “narrative” of the University’s admissions process, including many race-neutral recruitment programs intended to bolster minority enrollment. Id. at 645. And, indeed, the University’s many efforts to achieve a diverse campus learning environment without resorting to racial classifications are commendable. But, framing this history as something akin to a process of elimination, the majority finds that the University’s race-conscious admissions program must be necessary and narrowly tailored to the University’s diversity objectives. This is insufficient to satisfy strict scrutiny.
Certainly, the University’s past experiences -with race-neutral initiatives are relevant to the inquiry because the University must establish that “no workable race-neutral alternatives would produce the educational benefits of diversity,” and because the University’s “experience and expertise” provide some context to inform judicial review. Fisher, 133 S.Ct. at 2420. However, we cannot conclude that the University’s current race-conscious admissions program — the only matter before this court — is narrowly tailored to achieve the educational benefits of diversity because the University has failed to define what it means by “critical mass.” In other words, the University’s long history of purportedly unsuccessful alternatives is meaningless if we cannot discern the contours of the success it now seeks.
Additionally, the majority’s sustained focus on the Top Ten Percent Law is misplaced. While the Law is indeed central to this case, here, as in our previous consideration of this appeal, “[n]o party challenged, in the district court or in this court, the validity or the wisdom of the Top Ten Percent Law.” Fisher, 631 F.3d at 247 (King, J., specially concurring). Nevertheless, the majority forcefully indicts the Law for frustrating the University’s efforts to achieve well-rounded diversity. In the majority’s view, the Law’s shortcomings make a holistic review program more necessary. Ante, at 654 (‘We are persuaded that holistic review is a necessary complement to the Top Ten Percent Plan, enabling it to operate without reducing itself to a cover for a quota system. ...”). At most, the Law’s mechanical operation — admitting students based on the sole metric of high school class rank— might suggest that some form of holistic review is advisable to supplement the admissions process. But this issue is not before us at all. Our task is to determine whether the University’s injection of race into its admissions process survives strict scrutiny.
The Top Ten Percent Law matters only insofar as it causes the University to admit a large number of minority students separate and apart from the holistic review process. That is, the Law creates a separate admissions channel for many minority students, which then calls into question the necessity of using race as a factor in the holistic review process for filling the remaining seats. Whether, in light of the Top Ten Percent Law, race-conscious holistic review is more or less necessary is an open question, and it is the University that bears the burden of explaining how the Law impacts its achievement of its diversity goal. Here, it has failed to do so, under any theory of “critical mass” it has proffered.[25]
*676 * * *
The material facts of this case have remained unchanged since the district court’s grant of summary judgment, but the governing law has changed markedly. Fisher established that strict scrutiny in the higher education affirmative action setting is no different than strict scrutiny in other equal protection contexts — the state actor receives no deference in proving that its chosen race-conscious means are narrowly tailored to its ends. The majority fails to give Fisher its proper weight. Today’s opinion sidesteps the new strict scrutiny standard and continues to defer to the University’s claims that its use of racial classifications is narrowly tailored to its diversity goal. Because the University has not defined its diversity goal in any meaningful way — instead, reflexively reciting the term “critical mass” — it is altogether impossible to determine whether its use of racial classifications is narrowly tailored.
This is not to say, however, that it is impossible for a public university to define its diversity ends adequately for a court to verify narrow tailoring with the requisite exacting scrutiny. After all, “[sjtrict scrutiny must not be strict in theory but fatal in fact.” Fisher, 133 S.Ct. at 2421 (internal quotations omitted). It may even be possible for a university to do so while seeking a “critical mass.” What matters now, after Fisher, is that a state actor’s diversity goals must be sufficiently clear and definite such that a reviewing court can assess, without deference, whether its particular use of racial classifications is necessary and narrowly tailored to those goals. On this record, the University has not “offered sufficient evidence that would prove that its admissions program is narrowly tailored to obtain the educational benefits of diversity.” Fisher, 133 S.Ct. at 2421. Accordingly, I would reverse and render judgment for Fisher.
I respectfully dissent.

. As is Justice Scalia's concurrence, Fisher, 133 S.Ct. at 2422, Justice Thomas’s concurrence, id. at 2422-32, and Justice Ginsburg's dissent, id. at 2432-34.

. See Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 308 n. 11, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) ("[N]ominal damages, and not damages based on some undefinable ‘value’ of infringed rights, are the appropriate means of Vindicating' rights whose deprivation has not caused actual, provable injury.”); Devbrow v. Kalu, 705 F.3d 765, 769 (7th Cir.2013) ("[N]ominal damages are available as a remedy ... [for an abstract injury].”).

. The University's argument that Arizonans for Official English v. Arizona, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) governs Fisher's nominal monetary damages claim is without merit. Fisher does not rely solely on a "general prayer for relief” to save a case otherwise falling outside an Article III case or controversy from dismissal. Id. at 71, 117 S.Ct. 1055. Fisher’s original complaint specifically requested monetary damages.

. These principles are not challenged in this case. See infra note 8. However, I continue to believe that Grutter’s discussion of the "educational benefits of diversity,” drawing directly from the principles established in Bakke, "remains suspended at the highest levels of hypothesis and speculation,” Fisher, 631 F.3d at 255 (Garza, J., specially concurring).

. See Grutter, 539 U.S. at 388, 123 S.Ct. 2325 (Kennedy, J., dissenting) (“[T]he majority proceeds to nullify ... rigorous judicial review, with strict scrutiny as the controlling standard. ... The Court confuses deference to a university’s definition of its educational objective with deference to the implementation of this goal.”). I agree with the majority that Fisher represents a decisive shift in the law. See ante, at 642 ("Bringing forward Justice Kennedy's dissent in Grutter, the Supreme Court faulted the district court’s and this Court’s review of UT Austin’s means to achieve the permissible goal of diversity....”); see also Erwin Chemerinsky, The Court Affects Each of Us, 16 Green Bag 2d 361, 364 (2013) (“[Fisher] adopts a tougher, less sympathetic tone when it comes to affirmative action programs. For example, in Grutter, the Court spoke of the need to defer to the judgment of colleges and universities. In Fisher, the Court said that such deference was appropriate only as to the importance of diversity; there is no deference given as to whether race is necessary to achieve it.”).

. We need not determine whether the "strong basis in evidence” test from Croson applies in this case. See Croson, 488 U.S. at 510, 109 S.Ct. 706. Even without this test, the University fails to carry its strict scrutiny burden of proving that its race-conscious admissions policy is necessary to further its diversity interest.

. Notwithstanding the majority’s brief discussion of Schuette v. Coalition to Defend Affirmative Action, Integration and Immigrant Rights and Fight for Equality By Any Means Mecessary (BAMN), - U.S. -, 134 S.Ct. 1623, 188 L.Ed.2d 613 (2014), ante at 651, that case “is not about the constitutionality, or the merits, of race-conscious admissions policies in higher education,” and does not impact the analysis in today’s case. Schuette, 134 S.Ct. at 1630.

. The University’s decision to pursue the educational benefits of diversity, as established in Baldee, is not challenged in this case. See Fisher, 133 S.Ct. at 2419 (“[T]he parties here do not ask the Court to revisit that aspect of Grutter s holding.”). Our only concern is whether the University's means — its race-conscious holistic admissions program — are narrowly tailored to its diversity objective.

. There is some dispute about whether the University’s definition of "critical mass” is even before us as part of our narrow tailoring analysis. The University claims that this issue is outside the scope of the Supreme Court's remand because it is relevant only to its compelling interest in diversity. This contention misunderstands the way in which "critical mass”, matters to this case. Here, "critical mass” represents the goal the University purports to seek. The University uses this term as a representation of its ends. Fisher clearly establishes that reviewing courts must defer to the University’s decision to pursue such ends. 133 S.Ct. at 2419. But, it equally establishes that we cannot defer to the University's claim that "the means chosen ... to attain diversity are narrowly tailored to that goal.” Id. at 2420. . To conduct our own independent assessment of narrow tailoring— the judicial role under strict scrutiny — we must have a clear and definite understanding of the goal the University actually seeks. Accordingly, we must question the University’s explanation of “critical mass” to fulfill the task remanded to us by the Supreme Court.

. On remand, the University does not specifically delineate these arguments as such. Rather, it submits that these various consider *668 ations are sufficient to establish narrow tailoring. In any event, whether taken together or evaluated individually, none of these arguments establishes that the University's use of racial classifications in its admissions decisions is narrowly tailored.

. I agree with the majority's rejection of Fisher's arguments that the University had achieved "critical mass” in 2004, and that "critical mass” can be defined with reference to numbers alone. Fisher effectively asks us to ratify racial quotas, which we cannot, and will not, do. See Bakke, 438 U.S. at 317-18, 98 S.Ct. 2733 (disapproving quota systems and approving the use of race or ethnic background as a "plus” factor).

. Notwithstanding the University’s contention that 2008 witnessed an “unprecedented surge” in Top Ten Percent Law admissions, this is the only relevant year for purposes of our narrow tailoring analysis. Moreover, I continue to find the majority's use of data for both enrolled and admitted students to be misguided and potentially confusing. See ante, at 657-58. In my view, the proper metric is enrolled students because we are assessing whether the University’s means are narrowly tailored to its goal of attaining "the educational benefits of diversity” on campus. See Fisher, 631 F.3d at 260 n. 18 (Garza, L, specially concurring).

. For example, for the incoming class that enrolled in 2008, white students comprised 65% of all students admitted through holistic review, but only 52% of the entire incoming class.

. Dr. Kedra Ishop, Associate Director of Admissions, explained that all applicant files are assigned an AI and PAI, and that the AI and PAI of a Top Ten Percent Law applicant can still determine the program to which she is admitted, if her class rank is not high enough for automatic admission to a competitive first-choice program such as the School of Business.

.See ante, at 651 (discussing the "outcome gaps” of "segregated urban schools”); id. at 651 (classifying schools according to their racial and ethnic compositions). Additionally, the majority’s sua sponte survey of Texas school districts' data on racial composition, test scores, and educational outcomes, id. at 651-53, ventures far beyond the summary judgment record. Under strict scrutiny, the government bears the burden of establishing compliance with the Constitution. See Johnson, 543 U.S. at 505, 125 S.Ct. 1141. More specifically, the Supreme Court’s opinion has mandated that we decide whether "this record ... is sufficient” to demonstrate narrow tailoring. Fisher, 133 S.Ct. at 2421 (emphasis added).

. The majority’s reductionist assumption about the experiences of minority students admitted under the Top Ten Percent Law is startling: "The top 29 graduates from Jack Yates High School in Houston live in the same predominately African-American neighborhood of that city’s Third Ward, and thus likely experienced a similar cultural environment.” Ante, at 650 n. 98.

. This stereotyping is not limited to minority students admitted under the Top Ten Percent Law. The majority further assumes that mi *671 nority students admitted under holistic review, based on their "experience of being a minority in a majority-white ... school,” likely "demonstra[te] qualities of leadership and sense of self.” Ante, at 653. These conclusions are nonetheless stereotypes disallowed by the Fourteenth Amendment. And in any event, this record, by which we are bound, does not indicate that any minority students admitted under holistic review come from majority-white schools. See supra note 15.

. The record describes the admissions process as follows: First, the admissions staff read all applicants’ files, including those of Top Ten Percent Law applicants, and assign each an AI and PAI score. Applicants with exceptionally high class rank or AI scores are automatically admitted to certain first-choice schools or majors and, thus, also to the University. Next, for applicants not automatically admitted to their first choice, the staff generate a matrix for each school with each cell on the matrix representing an intersection of AI and PAI scores. Working with liaisons from each school, the staff plot the remaining applicants' scores on matrices according to the applicants' first-choice majors. Based *672 on the number of applicants in each matrix cell and the available seats in the class for each school, the admissions staff and liaisons draw "cut-off lines” across the matrices. Applicants not selected for admission to their first-choice school "cascade” onto the matrix for their second-choice school, where they are added to the cells along with applicants who were above the cut-off line during the previous review round. The cut-off lines are readjusted to accommodate the additional students, and those remaining above the adjusted cut-off lines are accepted to that school. Applicants not admitted to either their first- or second-choice school then "cascade” into the Liberal Arts Undecided matrix, which serves as the default third-choice major. Again, the admissions staff perform the line-drawing exercise (cognizant that remaining Top Ten Percent Law applicants must be admitted as Liberal Arts majors, thus reducing the number of available spaces), and a final determination is made for all applicants.

.When asked whether any one factor in the PAI calculation could be determinative for an applicant's admission, Dr. Bruce Walker, Vice Provost and Director of Admissions, stated "no.”

. Dr. Kedra Ishop was asked whether she could give an "example where race would have some impact on an applicant's personal achievement score?” Her answer: "In order to — it's impossible to say — to give you an example of a particular student because it's all contextual.”

. And race is entirely invisible at the moment of drawing the final admission cut-off lines, for students not automatically admitted to their first-choice program by virtue of an exceptionally high class rank or AI score. The University’s admissions staff and liaisons from each school admit students to the various schools and majors based solely on the combination of applicants’ AI and PAI scores. While race is considered in determining PAI scores, once the scores are assigned and applicants are plotted on the matrices for the various schools, admissions officers treat applicants as points on a grid. In other words, the University officials have no way of knowing whether they are selecting applicants whose race incrementally boosted their PAI score, much less whether any particular applicant will help the University improve classroom diversity.

. See ante, at 645 (describing the University's use of race with direct reference to the program approved in Grutter)', id. at 653 ("UT Austin's holistic review program — a program nearly indistinguishable from the University of Michigan Law School's program in Grutter ...’’).

. The majority implies that the University’s implementation of the Top Ten Percent Law was discretionary. See ante, at 645 ("UT Austin turned to the Top Ten Percent Plan....” (emphasis added)); id. at 645 ("We are offered no coherent response to the validity of a potentially different election by UT Austin: to invert the process and use Grutter s holistic review to select 80% or all of its students.” (emphasis added)). There was no such choice; the University was mandated by the law to admit any graduate in the top ten percent of his or her high school class. And, as explained below, the Top Ten Percent Law is not challenged in this appeal.

. Additionally, I observe that the admissions program here and that in Grutter do not seem to use race in the same way. Even accepting that the University uses race as a "factor of a factor of a factor,” here, the University incorporates race into the PAI before individual admissions decisions are made on the matrices, at which point race is invisible. See supra note 21. By contrast, in Grutter, each law school applicant’s file, including his or her racial classification, was considered during a holistic, full-file review. See 539 U.S. at 334-36, 123 S.Ct. 2325.

. There are additional elements of the majority's discussion of the Top Ten Percent Law *676 that I cannot join. First, to bolster the "necessity” of race-conscious holistic review, the majority explains that holistic-review admit-tees have higher standardized test scores. Ante, at 650 & nn. 96-97. However, no testimony or record evidence establishes whether the gap in SAT scores between Top Ten Percent and Non-Top Ten Percent admittees is statistically significant. And as the University’s president explained in 2000, "top 10 percent high school students make much higher grades in college than non-top 10 percent students,” and "[sjtrong academic performance in high school is an even better predictor of success in college than standardized test scores.” At best, the academic superiority of holistic review admittees as a group is highly contested. Second, legislative changes to the Top Ten Percent Law after 2008, the relevant year for our purposes, are not germane to our analysis. See ante, at 655 (discussing S.B. 175).