Justice KENNEDY delivered the opinion of the Court.
 

 The University of Texas at Austin considers race as one of various factors in its undergraduate admissions
 process. Race is not itself assigned a numerical value for each applicant, but the University has committed itself to increasing racial minority enrollment on campus. It refers to this goal as a "critical mass." Petitioner, who is Caucasian,
 sued the University after her application was rejected. She contends that the University's use of race in the admissions process violated the Equal Protection Clause of the Fourteenth Amendment.
 The parties asked the Court to review whether the judgment below was consistent with "this Court's decisions interpreting the Equal Protection Clause of the Fourteenth Amendment, including
 
 Grutter v. Bollinger,
 

 539 U.S. 306
 
 ,
 
 123 S.Ct. 2325
 
 ,
 
 156 L.Ed.2d 304
 
 (2003)." Pet. for Cert. i. The Court concludes that the Court of Appeals did not hold the University to the demanding burden of strict scrutiny articulated in
 
 Grutter
 
 and
 
 Regents of Univ. of Cal. v. Bakke,
 

 438 U.S. 265
 
 , 305,
 
 98 S.Ct. 2733
 
 ,
 
 57 L.Ed.2d 750
 
 (1978) (opinion of Powell, J.). Because the Court of Appeals did not apply the correct standard of strict scrutiny, its decision affirming the District Court's grant of summary judgment to the University was incorrect. That decision is vacated, and the case is remanded for further proceedings.
 I
 

 A
 

 Located in Austin, Texas, on the most renowned campus of the Texas state university system, the University is one of the leading institutions of higher education in the Nation. Admission is prized and competitive. In 2008, when petitioner sought admission to the University's entering class, she was 1 of 29,501 applicants. From this group 12,843 were admitted, and 6,715 accepted and enrolled. Petitioner was denied admission.
 

 In recent years the University has used three different programs to evaluate candidates for admission. The first is the program it used for some years before 1997, when the University considered two factors: a numerical score reflecting an applicant's test scores and academic performance in high school (Academic Index or AI), and the applicant's race. In 1996, this system was held unconstitutional by the United States Court of Appeals for the Fifth Circuit. It ruled the University's consideration of race violated the Equal Protection Clause because it did not further any compelling government interest.
 
 Hopwood v. Texas,
 

 78 F.3d 932
 
 , 955 (1996).
 

 The second program was adopted to comply with the
 
 Hopwood
 
 decision. The University stopped considering race in admissions and substituted instead a new holistic metric of a candidate's potential contribution to the University, to be used in conjunction with the Academic Index. This "Personal Achievement Index" (PAI) measures a student's leadership and work experience, awards, extracurricular activities, community service, and other special circumstances that give insight into a student's
 background. These included growing up in a single-parent home, speaking a language other than English at home, significant family responsibilities assumed by the applicant, and the general socioeconomic condition of the student's family. Seeking to address the decline in minority enrollment after
 
 Hopwood,
 
 the University also expanded its outreach programs
 
 .
 
 The Texas State Legislature also responded to the
 
 Hopwood
 
 decision. It enacted a measure known as the Top Ten Percent Law, codified at Tex. Educ.Code Ann. § 51.803 (West 2009). Also referred to as H.B. 588, the Top Ten Percent Law grants automatic admission to any public state college, including the University, to all students in the top 10% of their class at high schools in Texas that comply with certain standards.
 

 The University's revised admissions process, coupled with the operation of the Top Ten Percent Law, resulted in a more racially diverse environment at the University. Before the admissions program at issue in this case, in the last year under the post-
 
 Hopwood
 
 AI/PAI system that did not consider race, the entering class was 4.5% African-American and 16.9% Hispanic. This is in contrast with the 1996 pre-
 
 Hopwood
 
 and Top Ten Percent regime, when race was explicitly considered, and the University's entering freshman class was 4.1% African-American and 14.5% Hispanic.
 

 Following this Court's decisions in
 
 Grutter v. Bollinger,
 
 supra,
 

 and
 
 Gratz v. Bollinger,
 

 539 U.S. 244
 
 ,
 
 123 S.Ct. 2411
 
 ,
 
 156 L.Ed.2d 257
 
 (2003), the University adopted a third admissions program, the 2004 program in which the University reverted to explicit consideration of race. This is the program here at issue. In
 
 Grutter,
 
 the Court upheld the use of race as one of many "plus factors" in an admissions program that considered the overall individual contribution of each candidate. In
 
 Gratz,
 
 by contrast, the Court held unconstitutional Michigan's undergraduate admissions program, which automatically awarded points to applicants from certain racial minorities.
 

 The University's plan to resume race-conscious admissions was given formal expression in June 2004 in an internal document entitled Proposal to Consider Race and Ethnicity in Admissions (Proposal). Supp. App. 1a. The Proposal relied in substantial part on a study of a subset of undergraduate classes containing between 5 and 24 students. It
 showed that few of these classes had significant enrollment by members of racial minorities. In addition the Proposal relied on what it called "anecdotal" reports from students regarding their "interaction in the classroom." The Proposal concluded that the University lacked a "critical mass" of minority students and that to remedy the deficiency it was necessary to give explicit consideration to race in the undergraduate admissions program.
 

 To implement the Proposal the University included a student's race as a component of the PAI score, beginning with applicants in the fall of 2004. The University asks students to classify themselves from among five predefined racial categories on the application. Race is not assigned an explicit numerical value, but it is undisputed that race is a meaningful factor.
 

 Once applications have been scored, they are plotted on a grid with the Academic Index on the x-axis and the Personal Achievement Index on the y-axis. On that grid students are assigned to so-called cells based on their individual scores. All students in the cells falling above a certain line are admitted. All students below the line are not. Each college-such as Liberal Arts or Engineering-admits students separately. So a student is considered
 initially for her first-choice college, then for her second choice, and finally for general admission as an undeclared major.
 

 Petitioner applied for admission to the University's 2008 entering class and was rejected. She sued the University and various University officials in the United States District Court for the Western District of Texas. She alleged that the University's consideration of race in admissions violated the Equal Protection Clause. The parties cross-moved for summary judgment. The District Court granted summary judgment to the University. The United States Court of Appeals for the Fifth Circuit affirmed. It held that
 
 Grutter
 
 required courts to give substantial deference to the University, both in the definition of the compelling interest in diversity's
 benefits and in deciding whether its specific plan was narrowly tailored to achieve its stated goal. Applying that standard, the court upheld the University's admissions plan.
 
 631 F.3d 213
 
 , 217-218 (2011).
 

 Over the dissent of seven judges, the Court of Appeals denied petitioner's request for rehearing en banc. See
 
 644 F.3d 301
 
 , 303 (C.A.5 2011) (
 
 per curiam
 
 ). Petitioner sought a writ of certiorari. The writ was granted. 565 U.S. ----,
 
 132 S.Ct. 1536
 
 ,
 
 182 L.Ed.2d 160
 
 (2012).
 

 B
 

 Among the Court's cases involving racial classifications in education, there are three decisions that directly address the question of considering racial minority status as a positive or favorable factor in a university's admissions process, with the goal of achieving the educational benefits of a more diverse student body:
 
 Bakke,
 

 438 U.S. 265
 
 ,
 
 98 S.Ct. 2733
 
 ,
 
 57 L.Ed.2d 750
 
 ;
 
 Gratz,supra
 
 ; and
 
 Grutter,
 

 539 U.S. 306
 
 ,
 
 123 S.Ct. 2325
 
 ,
 
 156 L.Ed.2d 304
 
 . We take those cases as given for purposes of deciding this case.
 

 We begin with the principal opinion authored by Justice Powell in
 
 Bakke,
 

 supra
 

 . In
 
 Bakke,
 
 the Court considered a system used by the medical school of the University of California at Davis. From an entering class of 100 students the school had set aside 16 seats for minority applicants. In holding this program impermissible under the Equal Protection Clause Justice Powell's opinion stated certain basic premises. First, "decisions based on race or ethnic origin by faculties and administrations of state universities are reviewable under the Fourteenth Amendment."
 

 Id.,
 

 at 287
 
 ,
 
 98 S.Ct. 2733
 
 (separate opinion). The principle of equal protection admits no "artificial line of a 'two-class theory' " that "permits the recognition of special wards entitled to a degree of protection greater than that accorded others."
 

 Id.,
 

 at 295
 
 ,
 
 98 S.Ct. 2733
 
 . It is therefore irrelevant that a system of racial preferences in admissions may seem benign. Any racial classification must meet strict scrutiny, for when government decisions "touch upon an individual's race or ethnic background, he is entitled to a
 judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest."
 

 Id.,
 

 at 299
 
 ,
 
 98 S.Ct. 2733
 
 .
 

 Next, Justice Powell identified one compelling interest that could justify the consideration of race: the interest in the educational benefits that flow from a diverse student body. Redressing past discrimination could not serve as a compelling interest, because a university's "broad mission [of] education" is incompatible with making the "judicial, legislative, or administrative findings of constitutional or statutory violations" necessary to justify remedial racial classification.
 

 Id.,
 

 at 307-309
 
 ,
 
 98 S.Ct. 2733
 
 .
 

 The attainment of a diverse student body, by contrast, serves values beyond race alone, including enhanced classroom dialogue and the lessening of racial isolation and stereotypes. The academic mission of a university is "a special concern of the First Amendment."
 

 Id.,
 

 at 312
 
 ,
 
 98 S.Ct. 2733
 
 . Part of " 'the business of a university [is] to provide that atmosphere which is most conducive to speculation, experiment, and creation,' " and this in turn leads to the question of " 'who may be admitted to study.' "
 
 Sweezy v. New Hampshire,
 

 354 U.S. 234
 
 , 263,
 
 77 S.Ct. 1203
 
 ,
 
 1 L.Ed.2d 1311
 
 (1957) (Frankfurter, J., concurring in judgment).
 

 Justice Powell's central point, however, was that this interest in securing diversity's benefits, although a permissible objective, is complex. "It is not an interest in simple ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students. The diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element."
 
 Bakke,
 

 438 U.S., at 315
 
 ,
 
 98 S.Ct. 2733
 
 (separate opinion).
 

 In
 
 Gratz,
 

 539 U.S. 244
 
 ,
 
 123 S.Ct. 2411
 
 ,
 
 156 L.Ed.2d 257
 
 , and
 
 Grutter,
 
 supra,
 

 the Court endorsed the precepts stated by Justice Powell. In
 
 Grutter,
 
 the Court reaffirmed his conclusion that obtaining the educational benefits of "student body diversity is a compelling state interest that can justify the use of race in university admissions."
 

 Id.,
 

 at 325
 
 ,
 
 123 S.Ct. 2325
 
 .
 

 As
 
 Gratz
 
 and
 
 Grutter
 
 observed, however, this follows only if a clear precondition is met: The particular admissions process used for this objective is subject to judicial review. Race may not be considered unless the admissions process can withstand strict scrutiny. "Nothing in Justice Powell's opinion in
 
 Bakke
 
 signaled that a university may employ whatever means it desires to achieve the stated goal of diversity without regard to the limits imposed by our strict scrutiny analysis."
 
 Gratz,
 
 supra,
 

 at 275
 
 ,
 
 123 S.Ct. 2411
 
 ."To be narrowly tailored, a race-conscious admissions program cannot use a quota system,"
 
 Grutter,
 

 539 U.S., at 334
 
 ,
 
 123 S.Ct. 2325
 
 , but instead must "remain flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application,"
 

 id.,
 

 at 337
 
 ,
 
 123 S.Ct. 2325
 
 . Strict scrutiny requires the university to demonstrate with clarity that its "purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary ... to the accomplishment of its purpose."
 
 Bakke,
 

 438 U.S., at 305
 
 ,
 
 98 S.Ct. 2733
 
 (opinion of Powell, J.) (internal quotation marks omitted).
 

 While these are the cases that most specifically address the central issue in this case, additional guidance may be found in the Court's broader equal protection jurisprudence which applies in this context. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people,"
 
 Rice v. Cayetano,
 

 528 U.S. 495
 
 , 517,
 
 120 S.Ct. 1044
 
 ,
 
 145 L.Ed.2d 1007
 
 (2000) (internal quotation marks omitted), and therefore "are contrary to our traditions and hence constitutionally suspect,"
 
 Bolling v. Sharpe,
 

 347 U.S. 497
 
 , 499,
 
 74 S.Ct. 693
 
 ,
 
 98 L.Ed. 884
 
 (1954). " '[B]ecause racial characteristics so seldom provide a relevant basis for disparate treatment,' "
 
 Richmond v. J.A. Croson Co.,
 

 488 U.S. 469
 
 , 505,
 
 109 S.Ct. 706
 
 ,
 
 102 L.Ed.2d 854
 
 (1989) (quoting
 
 Fullilove v. Klutznick,
 

 448 U.S. 448
 
 , 533-534,
 
 100 S.Ct. 2758
 
 ,
 
 65 L.Ed.2d 902
 
 (1980)
 (Stevens, J., dissenting)), "the Equal Protection Clause demands that racial classifications ... be subjected to the 'most rigid scrutiny.' "
 
 Loving v. Virginia,
 

 388 U.S. 1
 
 , 11,
 
 87 S.Ct. 1817
 
 ,
 
 18 L.Ed.2d 1010
 
 (1967).
 

 To implement these canons, judicial review must begin from the position that "any official action that treats a person differently on account of his race or ethnic origin is inherently suspect."
 
 Fullilove,
 
 supra,
 

 at 523
 
 ,
 
 100 S.Ct. 2758
 
 (Stewart, J., dissenting);
 
 McLaughlin v. Florida,
 

 379 U.S. 184
 
 , 192,
 
 85 S.Ct. 283
 
 ,
 
 13 L.Ed.2d 222
 
 (1964). Strict scrutiny is a searching examination, and it is the government that bears the burden to prove " 'that the reasons for any [racial] classification [are] clearly identified and unquestionably legitimate,' "
 
 Croson,
 
 supra,
 

 at 505
 
 ,
 
 109 S.Ct. 706
 
 (quoting
 
 Fullilove,
 
 supra,
 

 448 U.S., at 533-535
 
 ,
 
 100 S.Ct. 2758
 
 (Stevens, J., dissenting)).
 

 II
 

 Grutter
 
 made clear that racial "classifications are constitutional only if they are narrowly tailored to further compelling governmental interests." 539 U.S., at 326,
 
 123 S.Ct. 2325
 
 . And
 
 Grutter
 
 endorsed Justice Powell's conclusion in
 
 Bakke
 
 that "the attainment of a diverse student body ... is a constitutionally permissible goal for an institution of higher education."
 
 438 U.S., at 311-312
 
 ,
 
 98 S.Ct. 2733
 
 (separate opinion). Thus, under
 
 Grutter,
 
 strict scrutiny must be applied to any admissions program using racial categories or classifications.
 

 According to
 
 Grutter,
 
 a university's "educational judgment that such diversity is essential to its educational mission is one to which we defer." 539 U.S., at 328,
 
 123 S.Ct. 2325
 
 .
 
 Grutter
 
 concluded that the decision to pursue "the educational benefits that flow from student body diversity,"
 

 id.,
 

 at 330
 
 ,
 
 123 S.Ct. 2325
 
 , that the University deems integral to its mission is, in substantial measure, an academic judgment to which some, but not complete, judicial deference is proper under
 
 Grutter
 
 . A court, of course, should ensure that there is a reasoned, principled explanation for the academic decision. On this point, the District Court and Court of Appeals were correct in finding
 that
 
 Grutter
 
 calls for deference to the University's conclusion, " 'based on its experience and expertise,' "
 
 631 F.3d, at 230
 
 (quoting
 
 645 F.Supp.2d 587
 
 , 603 (W.D.Tex.2009) ), that a diverse student body would serve its educational goals. There is disagreement about whether
 
 Grutter
 
 was consistent with the principles of equal protection in approving this compelling interest in diversity. See
 
 post,
 
 at 2422 (SCALIA, J., concurring);
 
 post,
 
 at 2423 - 2424 (THOMAS, J., concurring);
 
 post,
 
 at 2432 - 2433 (GINSBURG, J., dissenting). But the parties here do not ask the Court to revisit that aspect of
 
 Grutter
 
 's holding.
 

 A university is not permitted to define diversity as "some specified percentage of a particular group merely because of its race or ethnic origin."
 
 Bakke,
 
 supra,
 

 at 307
 
 ,
 
 98 S.Ct. 2733
 
 (opinion of Powell, J.). "That would amount to outright racial balancing, which is patently unconstitutional."
 
 Grutter,
 
 supra,
 

 at 330
 
 ,
 
 123 S.Ct. 2325
 
 ."Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.' "
 
 Parents Involved in Community Schools v. Seattle School Dist. No. 1,
 

 551 U.S. 701
 
 , 732,
 
 127 S.Ct. 2738
 
 ,
 
 168 L.Ed.2d 508
 
 (2007).
 

 Once the University has established that its goal of diversity is consistent with strict scrutiny, however, there must still be a further judicial determination that the admissions process meets
 strict scrutiny in its implementation. The University must prove that the means chosen by the University to attain diversity are narrowly tailored to that goal. On this point, the University receives no deference.
 
 Grutter
 
 made clear that it is for the courts, not for university administrators, to ensure that "[t]he means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose." 539 U.S., at 333,
 
 123 S.Ct. 2325
 
 (internal quotation marks omitted). True, a court can take account of a university's experience and expertise in adopting or rejecting certain admissions processes. But, as the Court said in
 
 Grutter,
 
 it remains at all times the University's obligation to demonstrate, and the Judiciary's
 obligation to determine, that admissions processes "ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application."
 
 Id
 
 ., at 337,
 
 123 S.Ct. 2325
 
 .
 

 Narrow tailoring also requires that the reviewing court verify that it is "necessary" for a university to use race to achieve the educational benefits of diversity.
 
 Bakke,
 
 supra,
 

 at 305
 
 ,
 
 98 S.Ct. 2733
 
 This involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications. Although "[n]arrow tailoring does not require exhaustion of every
 
 conceivable
 
 race-neutral alternative," strict scrutiny does require a court to examine with care, and not defer to, a university's "serious, good faith consideration of workable race-neutral alternatives." See
 
 Grutter,
 

 539 U.S., at 339-340
 
 ,
 
 123 S.Ct. 2325
 
 (emphasis added). Consideration by the university is of course necessary, but it is not sufficient to satisfy strict scrutiny: The reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity. If " 'a nonracial approach ... could promote the substantial interest about as well and at tolerable administrative expense,' "
 
 Wygant v. Jackson Bd. of Ed
 
 .,
 
 476 U.S. 267
 
 , 280, n. 6,
 
 106 S.Ct. 1842
 
 ,
 
 90 L.Ed.2d 260
 
 (1986) (quoting Greenawalt, Judicial Scrutiny of "Benign" Racial Preference in Law School Admissions,
 
 75 Colum. L.Rev. 559
 
 , 578-579 (1975) ), then the university may not consider race. A plaintiff, of course, bears the burden of placing the validity of a university's adoption of an affirmative action plan in issue. But strict scrutiny imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice.
 

 Rather than perform this searching examination, however, the Court of Appeals held petitioner could challenge only "whether [the University's] decision to reintroduce race as a factor in admissions was made in good faith."
 
 631 F.3d, at 236
 
 . And in considering such a challenge, the court would "presume the University acted in good faith" and place on petitioner the burden of rebutting that presumption.
 

 Id.,
 

 at 231-232
 
 . The Court of Appeals held that to "second-guess the merits" of this aspect of the University's decision was a task it was "ill-equipped to perform" and that it would attempt only to "ensure that [the University's] decision to adopt a race-conscious admissions policy followed from [a process of] good faith consideration."
 

 Id.,
 

 at 231
 
 . The Court of Appeals thus concluded that "the narrow-tailoring inquiry-like the compelling-interest inquiry-is undertaken with a degree of deference to the Universit[y]."
 

 Id.,
 

 at 232
 
 . Because "the efforts of the University have been studied, serious, and of high purpose," the Court of Appeals held that the use of race in the admissions
 program fell within "a constitutionally protected zone of discretion."
 

 Id.,
 

 at 231
 
 .
 

 These expressions of the controlling standard are at odds with
 
 Grutter
 
 's command that "all racial classifications imposed by government 'must be analyzed by a reviewing court under strict scrutiny.' " 539 U.S., at 326,
 
 123 S.Ct. 2325
 
 (quoting
 
 Adarand Constructors, Inc. v. Penã,
 

 515 U.S. 200
 
 , 227,
 
 115 S.Ct. 2097
 
 ,
 
 132 L.Ed.2d 158
 
 (1995) ). In
 
 Grutter,
 
 the Court approved the plan at issue upon concluding that it was not a quota, was sufficiently flexible, was limited in time, and followed "serious, good faith consideration of workable race-neutral alternatives." 539 U.S., at 339,
 
 123 S.Ct. 2325
 
 . As noted above, see
 
 supra,
 
 at 2415, the parties do not challenge, and the Court therefore does not consider, the correctness of that determination.
 

 Grutter
 
 did not hold that good faith would forgive an impermissible consideration of race. It must be remembered that "the mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or no weight."
 
 Croson,
 

 488 U.S., at 500
 
 ,
 
 109 S.Ct. 706
 
 . Strict scrutiny does not permit a court to accept a school's assertion that its admissions process uses race in a permissible way without a court giving close analysis to the evidence of how the process works in practice.
 

 The higher education dynamic does not change the narrow tailoring analysis of strict scrutiny applicable in other contexts. "[T]he analysis and level of scrutiny applied to determine the validity of [a racial] classification do not vary simply because the objective appears acceptable.... While the validity and importance of the objective may affect the outcome of the analysis, the analysis itself does not change."
 
 Mississippi Univ. for Women v. Hogan,
 

 458 U.S. 718
 
 , 724, n. 9,
 
 102 S.Ct. 3331
 
 ,
 
 73 L.Ed.2d 1090
 
 (1982).
 

 The District Court and Court of Appeals confined the strict scrutiny inquiry in too narrow a way by deferring to the University's good faith in its use of racial classifications and affirming the grant of summary judgment on that basis. The Court vacates that judgment, but fairness to the litigants and the courts that heard the case requires that it be remanded so that the admissions process can be considered and judged under a correct analysis. See
 
 Adarand, supra,
 
 at 237,
 
 115 S.Ct. 2097
 
 . Unlike
 
 Grutter,
 
 which was decided after trial, this case arises from cross-motions for summary judgment. In this case, as in similar cases, in determining whether summary judgment in favor of the University would be appropriate, the Court of Appeals must assess whether the University has offered sufficient evidence that would prove that its admissions program is narrowly tailored to obtain the educational benefits of diversity. Whether this record-and not "simple ... assurances of good intention,"
 
 Croson, supra,
 
 at 500,
 
 109 S.Ct. 706
 
 -is sufficient is a question for the Court of Appeals in the first instance.
 

 * * *
 

 Strict scrutiny must not be " 'strict in theory, but fatal in fact,' "
 
 Adarand,
 
 supra,
 

 at 237
 
 ,
 
 115 S.Ct. 2097
 
 ; see also
 
 Grutter,
 
 supra,
 

 at 326
 
 ,
 
 123 S.Ct. 2325
 
 . But the opposite is also true. Strict scrutiny must not be strict in theory but feeble in fact. In order for judicial review to be meaningful, a university must make a showing that its plan is narrowly tailored to achieve the only interest
 that this Court has approved in this context: the benefits of a student body diversity that "encompasses a ... broa[d] array of qualifications and characteristics of which racial or ethnic origin is but a single though important element."
 
 Bakke,
 

 438 U.S., at 315
 
 ,
 
 98 S.Ct. 2733
 
 (opinion of Powell, J.). The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.
 

 It is so ordered.
 

 Justice KAGAN took no part in the consideration or decision of this case.