Justice BEASLEY
concurring in part and dissenting in part.
I agree with the majority’s holding with respect to plaintiffs’ challenge under the “Good of the Whole” Clause in Article I, Section 2 of the Constitution of North Carolina. Nonetheless, because the twenty-six VRA districts at issue and two of the four non-VRA districts were created in direct contradiction to federal and state provisions, this Court should vacate the trial court’s judgment and remand the matter to the lower court for proper findings of fact and conclusions of law. I therefore respectfully dissent. Furthermore, there are several points of error, any of which would warrant vacating and remanding. With respect to the VRA districts, the record, supports the trial court’s conclusions that the VRA districts were drawn with race as the predominant motive and that strict scrutiny applies. Contrary to the conclusions reached by the *576 trial court and the majority, however, these districts fail strict scrutiny. With respect to the non-VRA districts, the trial court’s findings do not support its conclusions that race was not the predominant motive for the drafting of Senate District 32 and Congressional District 12. Because the shape and composition of invalid districts necessarily affect other districts, the redistricting plan at issue violates the Whole County Provisions set forth in Article II, Sections 3(3) and 5(3) of the Constitution of North Carolina.
I.
Though this honorable Court wishes to achieve finality in this appeal, the citizens of this state would be better served by this Court if we held our usual course and vacated and remanded the case to the trial court for proper findings of fact and conclusions of law based upon a correct interpretation of the law. I disagree with the majority’s assertion that doing so “would achieve nothing but delay” because “the panel has already conducted its analysis under th[e] [strict scrutiny] standard.” In its analysis the trial court incorrectly stated and applied the standard. At a minimum, proper findings, once made, would better illuminate defendants’ actions in view of the appropriate constitutional tests and would provide a better basis for proper review by this Court, potential consideration by the Supreme Court of the United States, and assessment by the citizens of North Carolina of our General Assembly’s actions and this Court’s decision.
In reaching its conclusions, the trial court misapplied precedent from this Court and the Supreme Court of the United States. The majority compounds the error by ignoring altogether the trial court’s explicit findings of fact and by too generously characterizing the General Assembly’s enacted plan. The majority’s departure from this Court’s usual course of adherence to our settled principles of appellate review could create a stain of suspicion among the citizens of the state regarding the actions of their elected officials and bodies of government— both legislative and judicial. See, e.g., State v. Carter, 322 N.C. 709, 722, 370 S.E.2d 553, 560 (1988) (“[W]e regard the crucial matter of the integrity of the judiciary ... to be [a] paramount consideration[ ].”).
II.
Contrary to the majority’s opinion, the trial court correctly concluded that strict scrutiny applies; however, the trial court incorrectly articulated the standard and therefore improperly applied its findings of fact to the standard. Of particular concern is the trial court’s finding that the General Assembly’s use of “rough proportionality” as a *577 redistricting “benchmark” survives strict scrutiny. This misstep is fatal to the VRA districts and consequently affects the legitimacy of non-VRA districts drawn in view of the Whole County Provisions. Although this Court should vacate and remand for reconsideration in light of correct principles, the majority attempts to cure the trial court’s errors and prematurely affirm an incomplete and incorrect judgment. As stated above, it would be impractical to vacate and remand piecemeal because the invalidity of at least one House, Senate, or Congressional district would necessarily compromise the shape and composition of the remaining districts in the affected group or groups.
A.
It is well established that “all laws that classify citizens on the basis of race, including racially gerrymandered districting schemes, are constitutionally suspect and must be strictly scrutinized.” Hunt v. Cromartie, 526 U.S. 541, 546, 119 S. Ct. 1545, 1548-49, 143 L. Ed. 2d 731, 737-38 (1999) (“Cromartie 7”) (citations omitted). “This is true whether or not the reason for the racial classification is benign or the purpose remedial.” Shaw v. Hunt, 517 U.S. 899, 904-05, 116 S. Ct. 1894, 1900, 135 L. Ed. 2d 207, 218 (1996) (“Shaw IF) (citations omitted). Yet, “[applying traditional equal protection principles in the voting-rights context is ‘a most delicate task’... because a legislature may be conscious of the voters’ races without using race as a basis for assigning voters to districts.” Id. at 905, 116 S. Ct. at 1900, 135 L. Ed. 2d at 218 (quoting Miller v. Johnson, 515 U.S. 900, 905, 115 S. Ct. 2475, 2483, 132 L. Ed. 2d 762, 772 (1995)). Only “when race becomes the ‘dominant and controlling’ consideration” is the right to equal protection jeopardized. Id. (quoting Miller, 515 U.S. at 913, 115 S. Ct. at 2486, 132 L. Ed. 2d at 777).
The burden to make this showing falls to the plaintiff:
The plaintiff’s burden is to show, either through circumstantial evidence of a district’s shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature’s decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations.
*578 Miller, 515 U.S. at 916, 115 S. Ct. at 2488, 132 L. Ed. 2d at 779-80.
If the plaintiff satisfies this initial burden of production, the redistricting legislation “cannot be upheld unless it satisfies strict scrutiny, [the] most rigorous and exacting standard of constitutional review.”[1] Id. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782. Once strict scrutiny review is triggered, the burden shifts to the State to “show not only that its redistricting plan was in pursuit of a compelling state interest, but also that ‘its districting legislation is narrowly tailored to achieve [that] compelling interest.’ ” Shaw II, 517 U.S. at 908, 116 S. Ct. at 1902, 135 L. Ed. 2d at 220-21 (alteration in original) (quoting Miller, 515 U.S. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782).
Here, while acknowledging the fact-intensive nature of the examination into whether race was the predominant factor motivating the legislature’s redistricting decision, the trial court believed that it was “able to by-pass this factual inquiry” for the twenty-six VRA districts:
The Plaintiffs collectively challenge as racial gerrymanders 9 Senate, 18 House and 3 U.S. Congressional districts created by the General Assembly in the Enacted Plans. Of those 30 challenged districts, it is undisputed that the General Assembly intended to create 26 of the challenged districts to be “Voting Rights Act districts” [hereinafter “VRA districts”] and that it set about to draw each of these VRA districts so as to include at least 50% Total Black Voting Age Population [hereinafter “TBVAP”]. Moreover, the General Assembly acknowledges that it intended to create as many VRA districts as needed to achieve a “roughly proportionate” number of Senate, House and Congressional districts as compared to the Black population in North Carolina. To draw districts based upon these criteria necessarily requires the drafters of districts to classify residents by race so as to include a sufficient number of black voters inside such districts, and consequently exclude white voters from the districts, in an effort to achieve a desired racial composition of >50% TBVAP and the desired “rough proportionality.” This is a racial classification.
*579 (footnote call numbers omitted). Accordingly, the trial court “conclude[d] .. . that in drawing [the] VRA districts ...[,] the shape, location and racial composition of each VRA district was predominantly determined by a racial objective and was the result of a racial classification sufficient to trigger the application of strict scrutiny as a matter of law.”
The majority explains that
[b]ecause of the trial court’s truncated findings of fact [as to whether race was “the General Assembly’s predominant motivation in forming the twenty-six VRA districts”], we do not know which other factors may have influenced the creation and shape of these twenty-six districts and the extent of any such influence. As a result, we do not know whether race fairly can be described as the predominant factor in the formation of these districts and whether, in turn, strict scrutiny was the appropriate standard of review.
The majority then analyzes the case as if strict scrutiny applies. This Court should remand for the trial court to clarify the full basis for its conclusion that plaintiffs have met their burden to show that race was the predominant factor. The record provides substantial evidence and the Supreme Court of the United States provides clear guidance on this point. Furthermore, as discussed below, the trial court’s subsequent findings with regard to proportionality inescapably lead to the conclusion that race was the predominant factor, thereby requiring strict scrutiny.
Plaintiffs and amici point to evidence showing that State Senator Robert Rucho and State Representative David Lewis, the respective chairs of the Senate and House Redistricting Committees, instructed Dr. Thomas Hofeller, the “chief architect” of the redistricting plans, to draw the plans to provide “substantial proportionality]” between the percentage of the state’s population that is Black and the percentage of districts that would be majority Black. Dr. Hofeller was also told to “draw a 50% plus one district wherever in the state there is a sufficiently compact black population” to do so. The public statements released by Senator Rucho and Representative Lewis also reflect these legislative goals, saying that, in order to comply with VRA section 2, the VRA districts are designed to provide Black voters with “substantial proportionality” and “must be established with a BVAP of 50% plus one.” As stated particularly well by the amici election law professors, this “undisputed, direct evidence” demonstrates the legis *580 lature’s intent to “creat[e] a certain number of majority-minority districts and then pack[ ] the maximum number of black voters possible into the districts.”[2] This evidence and the arguments advanced by plaintiffs and amici underscore the trial court’s error in “by-pass [ing] [its] factual inquiry.”
The Supreme Court of the United States has found similar evidence to be sufficient to trigger strict scrutiny of the redistricting plans. See, e.g., Bush v. Vera, 517 U.S. 952, 958-59, 116 S. Ct. 1941, 1951-52, 135 L. Ed. 2d 248, 257 (1996) (plurality) (explaining that strict scrutiny applies when race is “the predominant factor” in a legislature’s redistricting plan) (citation, emphasis, and quotation marks omitted); Id. at 1002, 116 S. Ct. at 1974, 135 L. Ed. 2d at 286 (Thomas & Scalia, JJ., concurring in the judgment) (explaining that Texas’s admission that “it intentionally created majority-minority districts” to comply with the VRA was “enough to require application of strict scrutiny in this suit”); Shaw II, 517 U.S. at 906, 116 S. Ct. at 1901, 135 L. Ed. 2d at 219 (applying strict scrutiny after “fail[ing] to see how” a court could “reach [ ] any conclusion other than that race was the predominant factor in” the General Assembly’s drawing of redistricting lines when the State admitted that its “overriding” purpose was to obtain preclearance from DOJ (citation, emphasis, and quotation marks omitted)); Miller, 515 U.S. at 919, 115 S. Ct. at 2490, 132 L. Ed. 2d at 781 (concluding that Georgia’s express desire to obtain preclearance was “powerful evidence that the legislature subordinated traditional districting principles to race when it ultimately enacted a plan creating three majority-black districts” and thus strict scrutiny applied). Accordingly in view of Vera, Shaw II, and Miller, the trial court in this case correctly concluded that strict scrutiny is the appropriate level of review to apply to the enacted plans.
*581 Nonetheless, the trial court improperly applied the standard. In its decision the trial court states that if plaintiffs meet the threshold burden of establishing that “race was the overriding consideration behind a redistricting plan,”
the state then has the burden of “producing evidence that the plan’s use of race is narrowly tailored to further a compelling state interest, and the plaintiffs bear the ultimate burden of persuading the court either that the proffered justification is not compelling or that the plan is not narrowly tailored to further it.” Shaw v. Hunt, 861 F. Supp. 408, 436 (E.D. N.C. 1994).
In support of this proposition, the trial court quotes the district court’s decision in Shaw II. In Shaw II, however, the Supreme Court of the United States reversed the trial court and, in doing so, held that under strict scrutiny, “North Carolina . . . must show not only that its redistricting plan was in pursuit of a compelling state interest, but also that ‘its districting legislation is narrowly tailored to achieve [that] compelling interest.’ ” 517 U.S. at 908, 116 S. Ct. at 1902, 135 L. Ed. 2d at 220-21 (alteration in original) (emphasis added) (quoting Miller, 515 U.S. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782). This language from Shaw II clearly places the burden of proof on the State once strict scrutiny is triggered.
This conclusion is bolstered by the Supreme Court’s earlier statement in Miller that, “[t]o satisfy strict scrutiny, the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest.” 515 U.S. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782 (emphasis added) (citations omitted). More recently, in the affirmative action context, the Supreme Court has been more explicit on this point: Under strict scrutiny, “it remains at all times the [government]’s obligation to demonstrate, and the Judiciary’s obligation to determine” that the challenged action is narrowly tailored to achieve a compelling governmental interest. Fisher v. Univ. of Tex. at Austin,_U.S._,_, 133 S. Ct. 2411, 2420, 186 L. Ed. 2d 474, 486-87 (2013) (emphasis added).
Here the trial court attempted to distinguish Fisher on the ground that the General Assembly is entitled to some degree of deference given that redistricting is “an inherently political process.” The Supreme Court, however, has declined to defer to political decision makers and apply something less than strict scrutiny to race-based classifications:
*582 But we have refused to defer to state officials’ judgments on race in . . . areas where those officials traditionally exercise substantial discretion. For example .... in the redistricting context, despite the traditional deference given to States when they design their electoral districts, we have subjected redistricting plans to strict scrutiny when States draw district lines based predominantly on race.
Johnson v. California, 543 U.S. 499, 512, 125 S. Ct. 1141, 1150, 160 L. Ed. 2d 949, 962-63 (2005) (citations omitted); accord Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 744, 127 S. Ct. 2738, 2766, 168 L. Ed. 2d 508, 539 (2007) (plurality) (explaining that “deference is fundamentally at odds with our equal protection jurisprudence” and that courts “put the burden on state actors to demonstrate that their race-based policies are justified” (citations and quotation marks omitted)). Moreover, to whatever extent the legislature may be entitled to deference, that “limited degree of leeway in furthering [its] interests” in complying with the VRA relates to whether the State has met its burden of establishing “the ‘narrow tailoring’ requirement of strict scrutiny.” Vera, 517 U.S. at 977, 116 S. Ct. at 1960, 135 L. Ed. 2d at 268 (plurality). Nonetheless, the State is not relieved of “the burden to prove ‘that the reasons for any [racial] classification [are] clearly identified and unquestionably legitimate.’ ” Fisher,_U.S. at_, 133 S. Ct. at 2419, 186 L. Ed. 2d at 485 (alterations in original) (emphasis added) (quoting City of Richmond v. J.A. Croson Co., 488 U.S. 469, 505, 109 S. Ct. 706, 728, 102 L. Ed. 2d 854, 889 (1989)).
Thus, the trial court’s misunderstanding and misapplication of the strict scrutiny analytical framework should warrant this Court’s vacating the trial court’s decision and remanding for reconsideration in light of correct principles. See id. at_, 133 S. Ct. at 2421, 186 L. Ed. 2d at 488 (remanding after determining that the trial court and court of appeals misapplied strict scrutiny standard to enable challenged admissions policy to “be considered and judged under a correct analysis”). Failure to apply properly the operative constitutional test is, in itself, a sufficient basis for overturning the trial court’s decision. See id.
B.
I turn next to address the invalidity of the twenty-six VRA districts. In view of the appropriate strict scrutiny standard, assuming that the state had a compelling interest in avoiding liability under *583 VRA section 2 and obtaining preclearance under VRA section 5,[3] and assuming that the factors set forth in Thornburg v. Gingles are met, the trial court’s findings with respect to proportionality do not support its ultimate conclusion that the redistricting plans pass strict scrutiny. Therefore, this Court should vacate and remand regarding the twenty-six VRA districts.
In Thornburg v. Gingles, 478 U.S. 30, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986), the Supreme Court set forth three “necessary preconditions” for a vote-dilution claim brought under VRA section 2: the minority group must be able to demonstrate that (1) it is “sufficiently large and geographically compact to constitute a majority in a single-member district”; (2) it is “politically cohesive”; and (3) the majority votes “sufficiently as a bloc to enable it . . . usually to defeat the minority’s preferred candidate.” Id. at 50-51, 106 S. Ct. at 2766-67, 92 L. Ed. 2d at 46-47 (citations omitted). “In a § 2 case, only when a party has established the Gingles requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances.” Bartlett v. Strickland, 556 U.S. 1, 11-12, 129 S. Ct. 1231, 1241, 173 L. Ed. 2d 173, 182 (2009) (plurality) (citations omitted). “While . . . proportionality is not dispositive in a [districting challenge], it is a relevant fact in the totality of circumstances to be analyzed .. ..” Johnson v. De Grandy, 512 U.S. 997, 1000, 114 S. Ct. 2647, 2651, 129 L. Ed. 2d 775, 784 (1994).
Here, in considering whether the General Assembly’s plan was narrowly tailored, the trial court reviewed, inter alia, defendants’ Memorandum, of Law in Support of their Motion for Summary Judgment. Defendants’ Memorandum states:
[defendants freely admit three principles followed by them in drawing the enacted legislative plans:
3. that the General Assembly would explore the possibility of establishing a sufficient number of VRA legislative districts to provide African-American voters with rough proportionality in *584 the number of VRA districts in which they have reasonable opportunity to elect their candidates of choice.
Defendants further state that they “increased the number of VRA districts to provide African American voters with rough proportionality in the number of districts in which they can elect candidates of choice.”
After reviewing defendants’ Memorandum and other materials, the trial court entered its judgment explaining the General Assembly’s use of proportionality in redrawing its district plans as follows:
The undisputed evidence establishes that the General Assembly, in drafting the Enacted Plans, endeavored to create VRA districts in roughly the same proportion as the ratio of Black population to total population in North Carolina. In other words, because the 2010 census figures established that 21% of North Carolina’s population over 18 years of age was “any part Black,” the corresponding rough proportion of Senate seats, out of 50 seats, would be 10 seats, and hence 10 VRA Senate districts. Likewise, of the 120 House seats, 21% of those seats would be roughly 25 House seats, and hence 25 VRA districts.
The General Assembly, in using “rough proportionality” as a benchmark for the number of VRA districts it created in the Enacted Plans, relies upon Supreme Court precedent that favorably endorses “rough proportionality” as a means by which a redistricting plan can provide minority voters with an equal opportunity to elect candidates of choice. League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 429-30 (2006) [hereinafter LULAC]; Shaw II, 517 U.S. at 916 n.8; De Grandy, 512 U.S. at 1000. In De Grandy, the Supreme Court said that “no violation of § 2 can be found . . ., where, in spite of continuing discrimination and racial bloc voting, minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters’ respective shares in the voting-age population.” 512 U.S. at 1013-1015. Where a State’s election districts reflect substantial proportionality between majority and minority populations, the Supreme Court explained, such districts would “thwart the historical tendency to exclude [the minority population], not encourage or perpetuate it.” Id. at 1014. It is reasonable for the General Assembly to rely upon this unequivocal holding of the Supreme Court in drafting a plan to avoid § 2 liability. When the Supreme Court says “no violation of § 2 can be found” under certain circumstances, prudence dictates that the General *585 Assembly should be given the leeway to seek to emulate those circumstances in its Enacted Plans.
(ellipsis in original) (emphases added) (footnote call number omitted). The trial court concluded that achieving rough proportionality was “not inconsistent with the General Assembly’s obligation to narrowly tailor the plans under strict scrutiny.” Although the trial court correctly cited the holding in De Grandy, the case does not support the trial court’s conclusion.
In De Grandy the Florida legislature drew majority-minority districts roughly proportionate in number to the minorities’ share of the total Florida population. While the Supreme Court held that such redistricting did not violate VRA section 2, the Court explicitly rejected the state’s proposed rule that “rough proportionality” would always immunize the state from VRA section 2 liability, stating:
[W]e reject the safe harbor rule because of... a tendency to promote and perpetuate efforts to devise majority-minority districts even in circumstances where they may not be necessary to achieve equal political and electoral opportunity. Because in its simplest form the State’s rule would shield from § 2 challenge a districting scheme in which the number of majority-minority districts reflected the minority’s share of the relevant population, the conclusiveness of the rule might be an irresistible inducement to create such districts. It bears recalling, however, that for all the virtues of majority-minority districts as remedial devices, they rely on a quintessentially race-conscious calculus aptly described as the “politics of second best.”
Id. at 1019-20, 114 S. Ct. at 2661, 129 L. Ed. 2d at 796 (citation omitted); see also id. at 1025, 114 S. Ct. at 2664, 129 L. Ed. 2d at 799 (O’Connor, J., concurring) (Proportionality, while “always relevant,” • is “never itself dispositive.”). Further, “the most blatant racial gerrymandering in half of a county’s single-member districts would be irrelevant under § 2 if offset by political gerrymandering in the other half, so long as proportionality was the bottom line.” Id. at 1019, 114 S. Ct. at 2661, 129 L. Ed. 2d at 796 (majority) (citations omitted). Thus, the Supreme Court admonished that an “inflexible rule” permitting the use of rough proportionality as a safe harbor “would run counter to the textual command of § 2, that the presence or absence of a violation be assessed ‘based on the totality of circumstances.’ The need for such ‘totality’ review springs from the demonstrated ingenuity of state and local governments in hobbling minority voting *586 power . . . Id. at 1018, 114 S. Ct. at 2660, 129 L. Ed. 2d at 795 (citations omitted).
A state legislature is thus required to determine whether each majority-minority district is reasonably necessary to afford minorities equal political and electoral opportunity. See League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 437, 126 S. Ct. 2594, 2620-21, 165 L. Ed. 2d 609, 643 (2006) (explaining that “proportionality” may not “displace” the “intensely local appraisal” of each challenged district (internal quotation marks omitted) (quoting Gingles, 478 U.S. at 79, 106 S. Ct. at 2781, 92 L. Ed. 2d at 65)). Here, however, defendants’ public statements undermine their adherence to the applicable standards and demonstrate the central role proportionality played in the 2011 redistricting plan. On 17 June 2011, defendants announced a public hearing on the matter, in which defendants sought redistricting plans with a sufficient number of majority-minority districts to provide substantial proportionality. Defendants recommended “that each plan include a sufficient number of majority African American districts to provide North Carolina’s African American citizens with a substantially proportional and equal opportunity to elect their preferred candidate of choice.” Defendants explained that “proportionality for the African American citizens in North Carolina means the creation of 24 majority African American House districts and 10 majority Senate districts. . . . Unlike the 2003 benchmark plans, the Chairs’ proposed 2011 plans will provide substantial proportionality for North Carolina’s African American citizens.”
Notwithstanding, based on its misreading of De Grandy, the trial court cites approvingly defendants’ use of proportionality as the “benchmark” for creating the enacted plan — beginning with proportionality as the goal and then working backwards to achieve that goal. Similarly, the trial court reasoned: “When the Supreme Court says ‘no violation of § 2 can be found’ under certain circumstances, prudence dictates that the General Assembly should be given the leeway to seek to emulate those circumstances in its Enacted Plans.” (quoting De Grandy, 512 U.S. at 1000, 114 S. Ct. at 2651, 129 L. Ed. 2d at 784). But this is precisely what the Supreme Court rejected in De Grandy: proportionality is relevant as a means to an end (compliance with the VRA), but it is not an end in itself and it does not — contrary to the trial court’s reasoning — provide a safe harbor for redistricting plans premised on race. The trial court’s misunderstanding of the applicable law permeates its analysis of the narrow tailoring requirement and leads it incorrectly to conclude that defendants’ use of proportionality as an end is constitutionally permissible.
*587 The majority states that “the trial court analyzed whether the legislature used proportionality in the enacted plans improperly to ‘link [ ] the number of majority-minority voting districts to minority members’ share of the relevant population.’ ” (alteration in original) (citation omitted). After setting forth various standards and principles, the majority summarily concludes that “the record here demonstrates that the General Assembly did not use proportionality improperly to guarantee the number of majority-minority voting districts based on the minority members’ share of the relevant population.” The majority is only able to draw this conclusion by ignoring the trial court’s determination — based upon “the undisputed evidence” — that the General Assembly used proportionality as a “benchmark.” The majority’s conclusion becomes more confusing when the majority states, “We believe that such an effort, seeking to guarantee proportional representation, proportional success, or racial balancing, would run afoul of the Equal Protection Clause.” (citing De Grandy, 512 U.S. at 1017-22, 114 S. Ct. at 2660-62, 129 L. Ed. 2d at 794-98). I agree “that such an effort . . . would run afoul of the Equal Protection Clause,” and it does here. In view of defendants’ public statements, defendants’ Memorandum of Law to the trial court, the undisputed evidence before the trial court, and the trial court’s unqualified finding that the legislature used proportionality as a “benchmark” for its redistricting plans, the majority’s attempt to explain otherwise is unconvincing and runs afoul of the United States Supreme Court’s warnings in De Grandy.
By characterizing the General Assembly’s consideration of race as a “prophylactic consideration” used “as a means of inoculating the redistricting plans against potential legal challenges under section 2’s totality of the circumstances test,” the majority compounds the trial court’s error and purports to establish the use of race as a legislative safe harbor in derogation of the clear prohibition against such use set forth by the Supreme Court of the United States. De Grandy, 512 U.S. at 1018-20, 114 S. Ct. at 2660-61, 129 L. Ed. 2d at 795-97. In light of these errors, this Court should vacate the trial court’s order and remand the case for reconsideration under a correct understanding of the law.
C.
With respect to the four non-VRA districts, plaintiffs challenge the trial court’s determination that “race was not the predominant motive in the creation of’ Senate District 32 and Congressional District 12. “The legislature’s motivation is itself a factual question,” *588 Cromartie I, 526 U.S. at 549, 119 S. Ct. at 1550,143 L. Ed. 2d at 740, and a trial court’s findings resolving factual issues in a nonjury trial are binding on appeal “if there is competent evidence to support them, even though the evidence could be viewed as supporting a different finding,” Stephenson v. Bartlett, 357 N.C. 301, 309, 582 S.E.2d 247, 252 (2003) (“Stephenson IF) (citation and quotation marks omitted).
i.
Looking first at Senate District 32, plaintiffs contend that the trial court’s findings actually undermine its conclusion that strict scrutiny does not apply because the districts are not race-based. The trial court found the following relevant facts:
204. As was true under the 2000 Census, under the 2010 Census there is insufficient TBVAP in Forsyth County to draw a majority-TBVAP Senate district in Forsyth County. However, because of concerns regarding the State’s potential liability under § 2 and § 5, Dr. Hofeller was instructed by the redistricting chairs to base the 2011 Senate District 32 on the 2003 versions of Senate District 32.
207. The first version of Senate District 32 that was released by the General Assembly had a TBVAP of 39.32%. Subsequently, the SCSJ plan was released. Its version of District 32 was located in a three-county and three-district group (Forsyth, Davie, Davidson). The SCSJ District 32 had a TBVAP of 41.95%. The SCSJ District 32 was a majority-minority coalition district with a non-Hispanic white population of 43.18%.
208. The redistricting chairs were concerned that any failure to match the TBVAP % found in the SCSJ District 32 could potentially subject the state to liability under § 2 or § 5 of the VRA. Therefore, Dr. Hofeller was instructed by the Redistricting Chairs to re-draw the State’s version of Senate District 32 so that it would at least equal the SCSJ version in terms of TBVAP.
As discussed above, the Supreme Court of the United States has held that when redistricting plans drawn in an attempt to preempt VRA section 2 litigation or obtain VRA section 5 preclearance are predominantly race-based, such plans attract strict scrutiny. See Vera, 517 U.S. at 959, 116 S. Ct. at 1951-52, 135 L. Ed. 2d at 257; Shaw II, 517 U.S. at 906-07, 116 S. Ct. at 1901, 135 L. Ed. 2d at 219-20; Miller, 515 U.S. at 920, 115 S. Ct. at 2490, 132 L. Ed. 2d at 782.
*589 The trial court acknowledged that compliance with the VRA was a motivating factor behind the enacted plans, but concluded that “comply[ing] with the Whole County Provision,... equalizing] population among the districts, . . . protecting] incumbents, and . . . satisfying] the General Assembly’s desire to enact redistricting plans that were more competitive for Republican candidates” were “equally dominant legislative motivations.” Notwithstanding, in the section of its fact-finding order addressing Senate District 32, the trial court made no findings regarding these other considerations. While the evidence might support such a conclusion, the trial court’s actual findings do not. Accordingly, this Court should vacate and remand on the issue of whether race was the predominant motivation behind the shape, location, and composition of Senate District 32.
ii.
With respect to Congressional District 12, the trial court’s findings belie a fundamental problem with redistricting, particularly in North Carolina, the importance of which cannot be overstated. In Easley v. Cromartie, 532 U.S. 234, 121 S. Ct. 1452, 149 L. Ed. 2d 430 (2001), the Supreme Court of the United States observed that “racial identification correlates highly with political affiliation” in North Carolina. Id. at 258, 121 S. Ct. at 1466, 149 L. Ed. 2d at 453. As such, the plaintiffs in that case “ha[d] not successfully shown that race, rather than politics, predominantly accounted] for” the shape, location, and composition of the 1997 version of Congressional District 12. Id. at 257,121 S. Ct. at 1466,149 L. Ed. 2d at 453. Because race and politics historically have been and currently remain intertwined in North Carolina, I cannot escape my conviction that politics are a pretext for this excruciatingly contorted race-based district. Therefore, the trial court incorrectly concluded that “the shape, location and composition of [this district]... included equally dominant legislative motivations ... to protect incumbents[ ] and to ... enact redistricting plans that were more competitive for Republican candidates.” To allow this serpentine district, which follows the 1-85 corridor between Mecklenburg and Guilford Counties, to be drafted for political advantage is a proxy for racial disenfranchisement and effectively creates a “magic words” threshold. Upholding this district’s tortured construction creates an incentive for legislators to stay “on script” and avoid mentioning race on the record, and in this instance, it is disingenuous to suggest that race is not the predominant factor. As such, this Court should vacate and remand as to Congressional District 12.
*590 iii.
With respect to House District 54 and Congressional District 4, the trial court also found that race was not the predominant motivating factor. Plaintiffs do not contest these determinations, and they are binding on appeal. Koufman v. Koufman, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). As stated above, however, because the shapes and compositions of the four non-VRA districts are necessarily affected by the VRA districts, it would be impossible to vacate and remand piecemeal.
D.
With respect to the Whole-County Provisions (“WCP”), plaintiffs contend that the trial court erred in .concluding that the enacted house and senate plans do not violate the provisions of the state constitution, which dictate that “[n]o county shall be divided in the formation of a senate district,” N.C. Const, art. II, § 3(3), and “[n]o county shall be divided in the formation of a representative district,” id. art. II, § 5(3). In Stephenson v. Bartlett, 355 N.C. 354, 562 S.E.2d 377 (2002) (“Stephenson 7”), this Court construed the WCP in light of federal law and “mandated that in creating legislative districts, counties shall not be divided except to the extent necessary to comply with federal law, including the ‘one-person, one-vote’ principle and the VRA.” Stephenson II, 357 N.C. at 309, 582 S.E.2d at 251-52 (citing Stephenson I, 355 N.C. at 363-64, 562 S.E.2d at 384-85). To ensure complete compliance with federal law and to provide maximum enforcement of the WCP, this Court “outlined in Stephenson I the following requirements that must be present in any constitutionally valid redistricting plan:”
. . . [T]o ensure full compliance with federal law, legislative districts required by the VRA shall be formed prior to creation of non-VRA districts. ... In the formation of VRA districts within the revised redistricting plans on remand, we likewise direct, the trial court to ensure that VRA districts are formed consistent with federal law and in a manner having no retrogressive effect upon minority voters. To the maximum extent practicable, such VRA districts shall also comply with the legal requirements of the WCP, as herein established ....
In forming new legislative districts, any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal “one-person, one-vote” requirements.
*591 In counties having a 2000 census population sufficient to support the formation of one non-VRA legislative district..., the WCP requires that the physical boundaries of any such non-VRA legislative district not cross or traverse the exterior geographic line of any such county.
When two or more non-VRA legislative districts may be created within a single county, . . . single-member non-VRA districts shall be formed within said county. Such non-VRA districts shall be compact and shall not traverse the exterior geographic boundary of any such county.
In counties having a non-VRA population pool which cannot support at least one legislative district... or, alternatively, counties having a non-VRA population pool which, if divided into districts, would not comply with the . . . “one-person, one-vote” standard, the requirements of the WCP are met by combining or grouping the minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent “one-person, one-vote” standard. Within any such contiguous multi-county grouping, compact districts shall be formed, consistent with the at or within plus or minus five percent standard, whose boundary lines do not cross or traverse the “exterior” line of the multi-county grouping; provided, however, that the resulting interior county lines created by any such groupings may be crossed or traversed in the creation of districts within said multi-county grouping but only to the extent necessary to comply with the at or within plus or minus five percent “one-person, one-vote” standard.
The intent underlying the WCP must be enforced to the maximum extent possible; thus, only the smallest number of counties necessary to comply with the at or within plus or minus five percent “one-person, one-vote” standard shall be combined[.]
. . . fCJommunities of interest should be considered in the formation of compact and contiguous electoral districts.
. . . [M]ulti-member districts shall not be used in the formation of legislative districts unless it is established that such districts are necessary to advance a compelling governmental interest.
Finally, we direct that any new redistricting plans, including any proposed on remand in this case, shall depart from *592 strict compliance with the legal requirements set forth herein only to the extent necessary to comply with federal law.
Stephenson II, 357 N.C. at 305-07, 582 S.E.2d at 250-51 (alterations in original) (quotation marks omitted) (quoting Stephenson I, 355 N.C. at 383-84, 562 S.E.2d at 396-97 (emphasis added)).
• In view of my analysis concerning plaintiffs’ equal protection claim, the WCP issue also warrants remanding the case because the General Assembly, in attempting to comply with Stephenson Fs Rule 1, drew the VRA districts before applying Rules 2 through 9. Because I conclude that the VRA districts are unconstitutional, this Court should instruct the General Assembly to redraft its redistricting plans. The unconstitutional VRA districts would necessarily affect the result of the General Assembly’s application of the rubric set forth in Stephenson I. See Pender Cnty. v. Bartlett, 361 N.C. 491, 508-09, 649 S.E.2d 364, 375 (2007) (concluding that a house district, created with the intent to comply with VRA section 2, was not required by the VRA and thus “must be drawn in accordance with the WCP and the Stephenson I requirements”), aff’d sub nom. Bartlett v. Strickland, 556 U.S. 1, 129 S. Ct. 1231, 173 L. Ed. 2d 173 (2009). As such, I would vacate and remand on this issue.
E.
Having carefully considered the precedent established by the Supreme Court of the United States, the decisions of this Court, and the record on appeal, it is important to recognize that race can be used as a factor fairly, but it equally important to emphasize that race must not be used punitively. To this end, it is important to be cognizant of race, not only in view of the historical record of our state and our nation, but also taking into account modern realities and future possibilities. It is for this reason that I note my concern with the majority’s statement that “no meaningful comparisons can be made” with “earlier redistricting plans approved in North Carolina” because “those plans were tailored to a particular time and were based upon then-existing census numbers and population concentrations.” Some comparisons may be of limited value, but increasingly sophisticated data processing and modes of visual representation may provide helpful comparisons among past, present, and proposed districts in view of past and present population concentrations. It would be a disservice to North Carolina’s citizens and our courts if the majority’s statements are read to foreclose without qualification any meaningful comparisons with earlier approved plans.
*593 III.
As discussed above, the trial court erred by making incomplete findings of fact and conclusions of law. Further, even using the findings as made by the trial court, the court’s judgment discloses several serious misapplications of law, which led the court to erroneous conclusions of law. There can be no serious debate that strict scrutiny applies in view of the General Assembly’s use of race as a benchmark for measuring the redistricting plan. The VRA districts are fatally defective in view of the legislature’s use of racial proportionality as a safe harbor, and the invalidity of these districts necessarily renders invalid the entire plan under settled federal constitutional standards announced by the Supreme Court of the United States. Similarly, the trial court’s findings regarding the non-VRA districts do not support its conclusions. Furthermore, these impermissibly racially gerrymandered districts fail under the Whole County Provision of the North Carolina Constitution. For any of these errors, this Court would do well to vacate and remand rather than prematurely affirm a defective and ultimately undemocratic districting plan.
Accordingly, I concur in that part of the majority’s opinion regarding plaintiffs’ remaining state claims related to the “Good of the Whole” Clause in Article I, Section 2 of. the Constitution of North Carolina, and respectfully dissent from those parts of the opinion affirming the trial court’s erroneous judgment.
Justice HUDSON joins in this opinion.

. “If, however, [the] plaintiff [ ] cannot show that race was the ‘predominant factor’ to which traditional districting principles were ‘subordinated,’ and thus cannot meet the threshold for triggering strict scrutiny, it follows that the facially neutral classification (the electoral district) will be subject, at most, to rational basis review.” Quilter v. Voinovich, 981 F. Supp. 1032, 1050 (N.D. Ohio 1997) (citing Miller, 515 U.S. at 915-16, 115 S. Ct. at 2488, 132 L. Ed. 2d at 779-80), aff’d, 523 U.S. 1043, 118 S. Ct. 1358, 140 L. Ed. 2d 508 (1998).

. “Packing” is one means of diluting minority voting strength. For example, “[a] minority group ... might have sufficient numbers to constitute a majority in three districts. So apportioned, the group inevitably will elect three candidates of its choice, assuming the group is sufficiently cohesive. But if the group is packed into two districts in which it constitutes a super-majority, it will be assured only two candidates.” Voinovich v. Quilter, 507 U.S. 146, 153-54, 113 S. Ct. 1149, 1155, 122 L. Ed. 2d 500, 511 (1993). In contrast to packing, minority voting strength may also be diluted by what is known as “cracking”: “A politically cohesive minority group that is large enough to constitute the majority in a single-member district has a good chance of electing its candidate of choice, if the group is placed in a district where it constitutes a majority. Dividing the minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice . . . .” Id. at 153, 113 S. Ct. at 1155, 122 L. Ed. 2d at 511.

. The United States Supreme Court has repeatedly assumed without deciding that compliance with the VRA can be a compelling state interest in the strict scrutiny context, but the Court has not expressly decided the issue. See Shaw II, 517 U.S. at 915, 116 S. Ct. at 1905, 135 L. Ed. 2d at 225 (“We assume, arguendo, for the purpose of resolving this suit, that compliance with § 2 could be a compelling interest . . . .”); Miller, 515 U.S. at 921, 115 S. Ct. at 2490-91, 132 L. Ed. 2d at 782 (assuming that satisfying “the Justice Department’s preclearance demands” can be a compelling interest).